## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| CORBIN COWAN, DAWN COWAN, STRATEGIC EQUITY PARTNERS, LLC, TRIUMPH TECHNOLOGIES, LLC, CAB VENTURES, LLC, JEREMY ENGEL, SPARTAN MARKETING & INVESTMENTS, LLC, INTELLITECH SOLUTIONS, LLC, SOLIDA EQUITY PARTNERS, LLC AND JOSH KIRK, | § § § § § § § § § § | |
| *Plaintiffs,* | § § | |
| v. | § § | CASE NO. _____ |
| JAMES TYLER BOYD, MIKE BOGGS, PETER D. HATZIPETROS, THE EDEN ALLIANCE, LLC, ANGELS CODING, LLC, and DAWN BOGGS, | § § § § § § § | |
| *Defendants.* | § § | |

## PLAINTIFFS' ORIGINAL COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

COME NOW, Plaintiffs Corbin Cowan, Dawn Cowan, Strategic Equity Partners LLC, Triumph Technologies LLC, CAB Ventures, LLC, Jeremy Engel, Spartan Marketing & Investments LLC, Intellitech Solutions, LLC, Solida Equity Partners, LLC, and Josh Kirk, and file this Original Complaint of and against Defendants James Tyler Boyd, Mike Boggs, Peter D. Hatzipetros, The Eden Alliance, LLC, Angels Coding, LLC, and Dawn Boggs, and, for cause, would respectfully show as follows:

## I.  INTRODUCTION

1.      This case is about deception, exploitation, and digital theft on a global scale. Defendants James Tyler Boyd and Mike Boggs, in conspiracy with Peter Hatzipetros, orchestrated an elaborate cryptocurrency fraud scheme under the guise of a proprietary trading platform that promised daily returns and ironclad security. What they delivered instead was a technologically concealed Ponzi operation—one designed to mislead investors, misappropriate millions in digital assets, and erase all trace of wrongdoing behind layers of blockchain obfuscation.

2.      Plaintiffs are several investors who placed trust, technology, and capital in the hands of Defendants. Like others, they were shown sophisticated dashboards, flown to Las Vegas for high-end demonstrations, and told that their funds were safe within impenetrable blockchain "nodes." The truth was very different: funds were diverted, code was altered, trading logs were falsified, and money was routed through anonymous exchanges and circular wallets.[1] Behind the polished façade was a system built to conceal—not trade.

3.      When the operation finally began to unravel, Boyd turned himself in to federal authorities, reportedly admitting to running an "international Ponzi scheme." But the damage was done. Millions in cryptocurrency remain missing. The infrastructure behind the platform, including servers, nodes, and security keys, is fractured, inaccessible, and compromised. And the victims, ordinary people misled by false assurances and high-tech smoke screens, are left without answers or recourse.

4.      Plaintiffs bring this action to recover wrongfully taken assets, unwind the fraudulent enterprise, and hold accountable those who engineered and profited from the deception.

---

[1] A "wallet" refers to a unique blockchain address (software or hardware) that can hold and transfer cryptocurrency, functionally comparable to a bank account number.

## II. PARTIES

1.  Plaintiff Corbin Cowan is an individual domiciled in Oklahoma.

2.  Plaintiff Dawn Cowan is an individual domiciled in Oklahoma.

3.  Strategic Equity Partners LLC is an Oklahoma limited liability company. Its members are domiciled in the State of Oklahoma.

4.  Triumph Technologies LLC is a Wyoming limited liability company. Its member is domiciled in the State of Oklahoma.

5.  CAB Ventures, LLC is a Wyoming limited liability company. Its member is domiciled in the State of Oklahoma.

6.  Spartan Marketing & Investments LLC is a Virginia limited liability company. Its members are domiciled in the State of Virginia.

7.  Plaintiff Intellitech Solutions, LLC is a Wyoming limited liability company, and its members are domiciled in Montana and Utah.

8.  Plaintiff Solida Equity Partners, LLC is a Delaware limited liability company with its principal place of business outside the State of Texas. Its members are residents of Texas and Florida.

9.  Plaintiff Jeremy Engel is an individual resident of Texas and is domiciled in Montgomery County, Texas.

10.  Plaintiff Josh Kirk is an individual resident of Texas and is domiciled in Montgomery County, Texas.

11.  Defendant James Tyler Boyd is an individual resident of Henderson, Nevada who operated and controlled the "D.A.W.N.N." trading system and associated infrastructure, directed investor solicitations, controlled wallets, executed fraudulent transactions, and laundered investor funds through non-custodial exchanges (ChangeNow and StealthEX), through AI-generated wallet

flows, and via a fabricated "profit wallet." He may be served at his last known business address located at 7544 Arroyo Crossing Parkway, Suite 246, Las Vegas, Nevada 89113.

12.     Defendant Mike Boggs is an individual resident of Pennsylvania co-solicited investors, designed and provided algorithmic trading logic, set up (or directed to be set up) the inception and master wallets, and assisted in fabricating the performance and transaction histories shown to investors. Defendant may be served at his last known address, 7712 Main Road, Bedford, PA 15522.

13.     Defendant Peter D. Hatzipetros is an attorney admitted to practice in New York, practicing under Petros Law Group, P.C., with principal office at 14 W 23rd Street, 5th Floor, New York, NY 10010. Upon information and belief, Mr. Hatzipetros is domiciled in the State of New York. On information and belief, Hatzipetros assisted Boggs and Boyd in structuring, registering, and maintaining shell entities and legal vehicles used in the soliciting, pooling, control, and concealment of investor funds; provided legal advice or arrangement services that enabled the creation of the fiction of legitimate corporate structure; and thereby contributed to the appearance of legitimacy and to the concealment of the true ownership, control, and flow of funds in the scheme. Mr. Hatzipetros may be served at his last known business address at 14 W 23rd Street, 5th Floor, New York, NY 10010.

14.     Defendant The Eden Alliance, LLC is a California limited liability company, with its principal business address at 1968 S. Coast Hwy, Suite #000, Laguna Beach, CA 92651; mailing address 1411 Cedar Terrace, Columbia, SC 29209; registered agent James T. Boyd. The Eden Alliance, LLC has been used by Defendants to solicit investments, hold or pool investor funds, and facilitate the fraudulent arbitrage and laundering scheme under the "D.A.W.N.N." / "Eden"

systems. The Eden Alliance, LLC may be served by and through its registered agent, James T. Boyd, at 1968 S. Coast Hwy, Suite #000, Laguna Beach, CA 92651.

15.     Defendant Angels Coding, LLC is a Pennsylvania limited liability company with its principal place of business located at 7712 Main Road, Bedford, PA 15522. Its registered agent for service of process is Michael Boggs at the same address. Angels Coding LLC has been used as a vehicle by Defendants to receive, conceal, and transfer investor funds as part of the fraudulent enterprise alleged herein.

16.     Defendant Dawn Boggs is an individual resident of Pennsylvania, and the spouse of Defendant Mike Boggs. On information and belief, she received and retained investor funds that were misappropriated through the fraudulent enterprise described herein. Dawn Boggs was a knowing beneficiary of the scheme, personally enriching herself from assets diverted from Plaintiffs and other investors. She may be served at her last known address located at 7712 Main Road, Bedford, PA 15522.

### III. JURISDICTION & VENUE

17.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the claims arise under federal law, including the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968. The Court also has supplemental jurisdiction over related state law claims pursuant to 28 U.S.C. § 1367.

18.     This Court has personal jurisdiction over Defendant James Tyler Boyd because he purposefully directed fraudulent activity toward the State of Texas. Boyd solicited investments from Texas residents, including Plaintiff Josh Kirk, and knowingly accepted substantial funds transmitted from Texas financial institutions. Boyd used those Texas-based investor funds to acquire and configure servers hosted in Las Vegas, Nevada, which were instrumental in operating the fraudulent algorithmic trading system at the core of this scheme. These servers were paid for,

in whole or in part, using capital sourced from Texas residents and the servers themselves were sent to Defendants – at Defendants' request – from Texas.

19.    This Court has personal jurisdiction over Defendants under 18 U.S.C. § 1965(b), which provides for nationwide service of process in civil RICO actions where "the ends of justice" so require. Venue is proper in this District as Defendants are alleged to have acted in concert with each other in the operation of a coordinated enterprise to defraud investors. The ends of justice require that all members of the RICO enterprise be brought before this Court to ensure comprehensive adjudication of the claims and uniform relief to affected investors.

20.    Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to the claims occurred in this District. Plaintiff Josh Kirk resides in this District, received representations from Defendants while located in Texas, and wired funds from Texas to accounts and systems ultimately controlled by Defendants. Additionally, the server infrastructure central to the scheme was funded using money transmitted from Texas, and Defendants' actions caused foreseeable injury to Texas residents.

## IV. FACTUAL BACKGROUND

21.    This case arises from a coordinated, high-tech fraud scheme in three interrelated phases: the investment solicitation, the operation of the scheme, and the eventual unraveling of the enterprise.

### A.  The Investment Phase

22.    In or around mid-2024, Defendants James Tyler Boyd and Mike Boggs began soliciting significant cryptocurrency investments from individuals across the country, including Plaintiffs Josh Kirk and Jeremy Engel, who reside in Texas. Boyd and Boggs represented that investor funds would be placed into a sophisticated, AI-powered trading system capable of exploiting price discrepancies across multiple cryptocurrency exchanges. This system, referred to

as "D.A.W.N.N.," (which purportedly stood for "Distributed Arbitrage with Neuro Networks"), was described as an automated arbitrage engine connected to up to fifty exchanges simultaneously.

23.     To attract investors, Defendants orchestrated high-end, theatrical presentations of wealth and technological prowess. Investors were flown into Las Vegas via chartered Gulfstream jets, given in-person demonstrations of the trading system, and shown equipment—including servers, computer nodes, and security devices—meant to impress upon them the apparent legitimacy and technological sophistication of the platform. Defendants claimed that funds placed into the system would remain secure in blockchain-based nodes that no single person could access, and that physical security chips were the only means of retrieval.

24.     Several investors, including some who placed $5 million or more into the system, were told that the funds were completely safe and could not be removed without multiple authentication layers. At least one investor was told that a node was mailed to them for safekeeping, and that without that device, no withdrawals could be made. Despite these representations, investor funds were repeatedly accessed, moved, and ultimately misappropriated.

25.     Defendants used The Eden Alliance, LLC as the entity under which they solicited investments, marketed the proprietary trading system, and represented to investors that funds would be pooled through Eden's entity structure.

26.     Defendants also represented that the core trading functionality relied on a proprietary algorithm and tunneling logic developed by Boggs. This logic was said to automatically analyze price discrepancies across various markets and execute arbitrage trades in real time, providing predictable daily returns and guaranteed profit in each transaction in which the system engaged.

27.    Plaintiffs entrusted substantial sums of money to Defendants during the investment phase of the scheme. The following chart details the specific contributions made by each Plaintiff:

| PLAINTIFF | AMOUNT INVESTED |
|---|---|
| Corbin Cowan | $750,000.00 |
| Dawn Cowan | $3,251,222.48 |
| Strategic Equity Partners LLC | $154,642.72 |
| CAB Ventures, LLC | $753,917.62 |
| Triumph Technologies, LLC | $445,000.00 |
| Solida Equity Partners, LLC | $224,955.00 |
| Spartan Marketing & Investments, LLC | $5,193,900.00 |
| Intellitech Solutions, LLC | $44,204,710.14 |
| Jeremy Engel | $11,456,451.50 |
| Josh Kirk | $6,823,051.00 |
| **Total** | **$72,010,140.96** |

## B. The Operation of the Scheme

28.    As later discovered, Boyd exercised control over the trading system's infrastructure. The visible "surface" system reviewed by developers and investors was merely a front. Boyd maintained a concealed secondary layer of infrastructure that operated in parallel to the visible trading environment. This underlayer rerouted funds through unmonitored wallets, obfuscated flow paths, and concealed true liquidity behavior.

29.    Boggs, who was responsible for designing the original system backend and algorithmic logic (referred to internally as the "tunneler"), turned over his code to Boyd. Boyd implemented it into the system—but then secretly branched it. Though Boggs was initially able to verify that his source code was live, Boyd used a combination of faked two-factor authentication (2FA) and wallet veiling to conduct operations beneath that visible code layer.

30.    The scheme involved wallet dusting (splitting transactions into tiny, untraceable amounts), circular trading, liquidity recycling, and concealed smart contract mechanics.

31.    As further evidence of Boggs and Boyd's fraud, Boggs and Boyd induced Intellitech Solutions, LLC to pay a total of $5,239,845.00 to Boggs's entity Angels Coding LLC

for "server hosting" at Switch (a Las Vegas data center). This payment, while nominally for hosting services, in fact constituted a transfer of investor funds into another entity controlled by Defendants. The Angels Coding entity did not perform legitimate hosting operations but rather acted as a conduit for siphoning assets. The reference to Switch was used to lend legitimacy and technological cover to the diversion, when in truth it was part of the layering and laundering process orchestrated by Boyd and Boggs.

### C.  Laundering through ChangeNow and StealthEX

32.     Transactions were routed through ChangeNow, a non-custodial exchange platform that does not itself hold cryptocurrency but instead integrates with multiple other exchanges to facilitate swaps at reduced cost. ChangeNow's aggregation of millions of transactions created the appearance of liquidity but made tracing counterparties impossible. Boyd represented to Plaintiffs that profits were being converted into USDC, a stablecoin pegged to the U.S. dollar, to stabilize returns. In reality, Boyd instead converted profits into XRP, undermining stability and setting up further laundering.

33.     From there, Boyd routed the XRP through StealthEX, another non-custodial exchange. Unlike ChangeNow, StealthEX required no account, no sign-up, and no identification. It allowed direct swaps into Privacy Tokens, which conceal the sender, receiver, and amount of each transaction. Such tokens are widely associated with money laundering and terrorism financing because they frustrate regulatory oversight. Once converted, the funds could be moved into anonymous cold wallets—devices such as USB drives—rendering them permanently inaccessible to Plaintiffs or regulators.

34.     Investor funds were invested through Eden Alliance, LLC; from Eden's entity structure the funds were passed into the concealed wallet systems; assets funneled through Eden were routed through ChangeNow and StealthEX etc., to effect conversion / obfuscation.

35. This ChangeNow–StealthEX laundering path became central to the scheme. Even after Boyd turned himself in to federal authorities, additional wallets holding investor principal were routed through the same cycle.

### D. Fabricated Wallet Flows and AI Transactions

36. In addition to laundering, Defendants fabricated trading histories to deceive investors into believing that the "System" was generating legitimate arbitrage profits.

37. Plaintiffs were instructed to send investments (often in USDT-TRC20) to "inception wallets" provided by Boggs. These funds were then moved into "master wallets" that Defendants claimed deployed liquidity to profitable trades.

38. In reality, Boyd and Boggs used an AI engine to generate thousands of wallets that simply sent cryptocurrency back and forth with one another. This created artificial transaction histories that gave the appearance of arbitrage profits. Prospective investors auditing these wallets through blockchain explorers such as Etherscan.io, Tronscan.org, and Blockscan would see seemingly legitimate flows, when in truth the transactions were circular and produced no real gain.

39. Plaintiffs were even provided with a link to a purported "profit wallet"—an XRP wallet receiving remnants of these fabricated transactions. Defendants represented this wallet as evidence of arbitrage profits. In fact, it was nothing more than accumulated residue from thousands of sham transactions.

### E. Figures and Forensic Analysis

40. Detailed analysis of XRP transactions revealed a recurring circular trading pattern. Over 247,000 XRP were funneled through a central liquidity address, which also acted as the largest contributor to its own inflows—an unmistakable indicator of intentional recycling and concealment.



**Figure 1:** Schematic representation of XRP wallet flows showing circular trading, where funds were routed through intermediary wallets and recycled back to a primary target address to simulate legitimate activity.

41.    A comparable pattern emerged in the Litecoin chain, where over 107,000 transactions were funneled through three focal wallets connected to a single liquidity address. The use of dust transactions and widespread wallet separation was consistent with an intent to frustrate tracing.



**Figure 2:** Simplified flowchart of Litecoin transactions highlighting separation between originating addresses, intermediary holding wallets, and liquidity destinations — used to obscure asset flows.

42.     Contributors including Plaintiffs later discovered that they had limited or no visibility into actual transaction records, logs, or liquidity endpoints. Boyd controlled all high-security credentials, including HSM clients (hardware security modules) and encryption keys. Authentication protocols presented during development were simulated—giving the false impression of oversight while eliminating any practical access to backend functionality.

**F.  The Parallel System – Eden Alliance**

43.     While Boyd operated the concealed layer of the "D.A.W.N.N." system, Boggs was simultaneously marketing a parallel system known as Eden Alliance. The Eden Alliance, LLC, incorporated in California on April 17, 2023, with Boyd as its registered agent, served as a corporate vehicle through which Defendants misled investors about the nature, safety, and expected returns of the investment. Eden Alliance, LLC was presented as a legitimate R&D / arbitrage entity, issuing performance figures, contracting with investors, and holding or controlling funds in inception and master wallets.

44.    Using the same infrastructure, Boggs solicited millions from another group of investors, promising identical arbitrage functionality and security. Funds from both projects—D.A.W.N.N. and Eden—were funneled through the same concealed ecosystem, intermingled, and used to fund Defendants' personal expenses, high-stakes gambling, and extravagant lifestyles.

45.    The scheme also incorporated complex smart contract features, including time-locked contracts,[2] administrative backdoors,[3] and intentionally flawed withdrawal logic. Contracts deployed on Ethereum and Avalanche networks were engineered with hidden control functions. DeFi protocol positions[4] on Curve, Uniswap, Compound, and Aave were similarly manipulated using accounts ultimately tied to the Defendants. Investigators later identified flawed smart contracts used to conceal recoverable assets through timestamp manipulation and improper access controls.

46.    In furtherance of these activities, Defendant Boggs relied on Peter D. Hatzipetros, his personal attorney, who assisted in structuring and registering shell entities that were used to hold investor funds and obfuscate control of the enterprise. On information and belief, Hatzipetros facilitated the creation of legal vehicles that enabled Boggs and Boyd to represent to investors that funds were institutionally housed, when in truth they remained under Defendants' exclusive control. Although the full extent of Hatzipetros's involvement remains to be determined through discovery, his participation in forming and maintaining the corporate entities integral to the scheme contributed to the appearance of legitimacy and concealment of the fraud.

---

[2] A "time-locked contract" is a smart contract designed to hold assets until a present future time; if tampered with, funds can be released prematurely.

[3] A "backdoor function" refers to a hidden programming code within a smart contract that allows its creator to override stated rules and withdraw funds unilaterally.

[4] A "DeFi" position is a deposit, loan, or liquidity stake held in a decentralized-finance protocol (*e.g.*, Aave, Curve, Uniswap) to earn yield or facilitate trading.

### G. The Fallout

47.     By mid-2025, the platform had ceased functioning, and investors began to grow suspicious. Withdrawals were delayed indefinitely, and the explanations offered—such as server maintenance or RAM replacements—grew increasingly implausible.

48.     Boyd ultimately turned himself in to the FBI, reportedly admitting to operating an "international Ponzi scheme." Boyd's father, who had been contacted by defrauded Eden Alliance investors, was alerted to the scale of the operation. Boyd's home in Henderson, Nevada, is believed to have been a central point for coordinating the fraud.

49.     When questioned, Boggs attempted to shift blame to Boyd and provided inconsistent reports to concerned investors, at one point claiming the FBI was at his office, a claim which could not be verified.

50.     Subsequent forensic analysis of the system revealed that even those involved in building the infrastructure were unable to detect the concealed layer of operations until after the platform's collapse. By then, the branching of code, manipulation of wallet flows, and fabrication of authentication safeguards had already succeeded in rerouting assets beyond recovery.

51.     To date, much of the infrastructure remains inaccessible. Master keys and access credentials were compartmentalized across multiple engineers, many of whom have since gone silent. Attempts to recover server access through Boyd's associate have failed, and communications with him have ceased. Internal team discussions indicate that Boggs retained encrypted copies of the algorithmic code, and that additional redundancies may still exist within the Switch environment. However, full system recovery would require expert redevelopment and re-deployment, as the entirety of the original environment was subject to cloning and concealment.

52.     On information and belief, a portion of investor funds diverted through ChangeNow, StealthEX, and the Eden Alliance structure were funneled to accounts and assets

controlled by Dawn Boggs, the wife of Defendant Mike Boggs. Plaintiffs have reason to believe that Dawn Boggs knowingly accepted investor funds for her personal benefit and participated in concealing assets traceable to the scheme.

53.     Despite these challenges, forensic efforts continue. A dedicated asset recovery team has been working to identify flows through ChangeNow and uncover stagnant wallets. Plaintiffs and similarly situated investors continue to face significant financial harm as a result of Defendants' coordinated deception.

## V.  CLAIMS

### A.  COUNT ONE: VIOLATION OF RICO (18 U.S.C. § 1962(c)) (Conducting the Affairs of an Enterprise Through a Pattern of Racketeering Activity)

54.     Plaintiffs reallege and incorporate by reference paragraphs 1-45 of the Complaint and the Factual Background.

55.     Defendants James Tyler Boyd, Mike Boggs, Peter D. Hatzipetros, and The Eden Alliance, LLC (the "RICO Persons") are each a "person" within the meaning of 18 U.S.C. § 1961(3).

56.     Beginning no later than June 2024 and continuing through at least July 2025, Boyd, Boggs, Hatzipetros, and The Eden Alliance, LLC associated together, along with various shell entities in an association-in-fact enterprise (the "Boyd–Boggs–Eden Enterprise") within the meaning of 18 U.S.C. § 1961(4).

57.     The Enterprise had an ongoing structure and purpose: (a) to solicit cryptocurrency "investments" under false pretenses, (b) to divert those assets to wallets exclusively controlled by Boyd and Boggs, (c) to launder the proceeds through anonymous, non-custodial exchanges such as ChangeNow and StealthEX, (d) to conceal the diversion by fabricating transaction histories, "profit wallets," and sham arbitrage dashboards, and (e) to use corporate entities-including The

Eden Alliance, LLC, structured and maintained with assistance from attorney Peter D. Hatzipetros-to provide an appearance of legitimacy, frustrate detection by regulators, and shield Defendants' conduct.

58.    The Enterprise was separate and distinct from the racketeering acts described below; it maintained dedicated servers, wallet clusters, and exchange accounts, and it continued to exist after individual fraudulent transactions were completed.

59.    Boyd directed the technical infrastructure of the Enterprise by configuring concealed servers, maintaining administrative keys, and singlehandedly controlling multisignature wallets. Boggs directed investor solicitation and algorithm design by drafting offering materials, pitching the proprietary "D.A.W.N.N." and "Eden" arbitrage engines, and providing the code that Boyd later branched and weaponized. Hatzipetros, acting as Boggs's attorney and advisor, facilitated the creation of Eden Alliance and other shell entities to house investor funds and provide a veneer of legitimacy. The Eden Alliance, LLC itself served as a corporate vehicle through which investor money was solicited, received, pooled, and diverted.

60.    Each Defendant therefore conducted or participated, directly or indirectly, in the operation or management of the Enterprise's affairs.

61.    The Boyd–Boggs–Eden Enterprise engaged in multiple acts of wire fraud (18 U.S.C. § 1343) and money laundering (18 U.S.C. § 1956), including, but not limited to, the following exemplar acts:

- July 8, 2024: Boggs emailed Plaintiff Josh Kirk from m.boggs@—.com attaching a slide deck that falsely represented daily returns of "1.5 % guaranteed" and claimed that investor funds "remain immovable in secure nodes." The email was transmitted via interstate wires from Pennsylvania to Texas.

- October 22, 2024: At Boyd's instruction Plaintiff Josh Kirk wired 1,250,000 USDC from a wallet in Texas to Enterprise wallet 0x9210…d638 on the Ethereum network. Within hours, Boyd fragmented the funds through twelve "dust" transfers, then routed the bulk to ChangeNow, falsely representing that they would be stabilized in USDC. Instead, Boyd converted them into XRP and immediately funneled them through StealthEX, exchanging into Privacy Tokens designed to defeat regulatory oversight.

- December 2024: Using The Eden Alliance, LLC as the front-facing entity, Defendants solicited additional investor funds through contracts signed under Eden's name, funneled those assets into inception and master wallets, and laundered them through ChangeNow and StealthEX in the same manner.

- March 2025: Defendants provided Plaintiffs with a link to an XRP wallet purportedly reflecting arbitrage proceeds. In reality, the wallet consisted of accumulated remnants of thousands of sham AI-generated transactions, designed to create the illusion of profitability and induce additional investment.

- January–May 2025: Intellitech LLC wired $1.4 million and transferred $3.84 million in USDT to Angels Coding LLC, ostensibly for server hosting at Switch. These transactions were, on information and belief, funded with investor assets and served as a laundering mechanism for the Enterprise.

62.    These acts are related (they share the same perpetrators, methods, and illicit purpose) and exhibit closed-ended continuity, spanning more than a year and comprising hundreds of discrete wire transmissions and laundering acts.

63.    As a direct and proximate result of the pattern of racketeering activity, Plaintiffs have been deprived of no less than $5 million in digital assets, exclusive of lost appreciation, and continue to suffer ongoing investigative and mitigation expenses. The injuries flowed directly from Defendants' fraudulent wires and laundering activities; but for the misrepresentations and diversion, Plaintiffs' cryptocurrency would have remained in their possession.

64.    Plaintiffs seek judgment against Defendants for treble damages under 18 U.S.C. § 1964(c), reasonable attorney's fees and costs, prejudgment interest, and such other relief as the Court deems just and proper.

### B.  COUNT TWO: VIOLATION OF 18 U.S.C. § 1962(d) (RICO Conspiracy)

65.    Plaintiffs reallege and fully  incorporate the preceding factual allegations as if set forth in full herein.

66.    Defendants James Tyler Boyd, Mike Boggs, Peter D. Hatzipetros, Angels Coding, LLC, and The Eden Alliance, LLC knowingly agreed to facilitate the conduct of the Boyd–Boggs–Eden Enterprise through the pattern of racketeering detailed herein. Each Defendant understood the scope of the unlawful scheme and joined in it to achieve its fraudulent purpose.

67.    Overt acts in furtherance of the conspiracy include, inter alia:

   a.  Drafting and circulating false investment term sheets (June 2024);

   b.  Chartering a Gulfstream jet to transport investors to staged demonstrations in Las Vegas (September 2024);

   c.  Retaining attorney Peter D. Hatzipetros to structure and register shell entities, including The Eden Alliance, LLC, in order to house investor funds and provide an appearance of legitimacy (Summer 2024);

   d.  Using The Eden Alliance, LLC to solicit and contract with investors under the guise of legitimate arbitrage operations (Fall 2024);

e.  Routing investor funds through ChangeNow and StealthEX to exchange principal into Privacy Tokens (October 2024 through mid-2025); and

f.  Transferring investor funds into accounts controlled by Dawn Boggs for her personal use and benefit (Winter 2024–Spring 2025).

68.  Each Defendant thus conspired to violate § 1962(c) and is jointly and severally liable for the resulting damages.

69.  Plaintiffs seek the same monetary and equitable relief described in Count One, together with all additional relief the Court deems equitable to redress the conspiracy.

## C.  COUNT THREE: CONVERSION

70.  Plaintiffs reallege and fully incorporate by reference the preceding paragraphs as if fully set forth herein.

71.  Defendants Boyd, Boggs, Hatzipetros, The Eden Alliance, LLC, and Dawn Boggs wrongfully exercised dominion and control over cryptocurrency and other digital assets that rightfully belonged to Plaintiffs.

72.  Defendants intentionally retained, transferred, and used those assets in a manner inconsistent with Plaintiffs' rights, including by:

a.  Routing Plaintiffs' assets through ChangeNow under the false pretense that they were being stabilized in USDC, when in reality they were converted into XRP for further concealment;

b.  Using StealthEX to exchange XRP into Privacy Tokens, thereby eliminating all visibility into the location or value of Plaintiffs' funds;

c.  Cycling assets through AI-generated wallets to fabricate trading histories and simulate arbitrage profits;

d. Diverting remnants of sham transactions into a fabricated "profit wallet" falsely represented as arbitrage proceeds;

e. Wrongfully exercising dominion and control over at least $5,239,845 in funds from Intellitech Solutions, LLC, received through a combination of bank wires and USDT transfers;

f. Using The Eden Alliance, LLC as a vehicle to solicit, hold, and divert investor funds; and

g. Leveraging Peter D. Hatzipetros's legal services to create and maintain shell entities through which investor principal was channeled, concealed, and ultimately converted.

73.    As a direct and proximate result of Defendants' actions, Plaintiffs have suffered damages and are entitled to the return of the converted assets, or their equivalent value, together with interest and any other appropriate relief.

### D. COUNT FOUR: BREACH OF FIDUCIARY DUTY

74.    Plaintiffs reallege and fully incorporate by reference the preceding paragraphs as if fully set forth herein.

75.    By soliciting and receiving digital assets from Plaintiffs for the purpose of trading on their behalf, Defendants assumed a fiduciary duty to act with the utmost good faith, loyalty, and care.

76.    Defendants breached these duties by:

a. Misrepresenting that investor funds would remain stable and secure, when in fact they were funneled through opaque, non-custodial exchanges;

b. Laundering assets through ChangeNow and StealthEX, including by converting funds into Privacy Tokens designed to prevent oversight;

c. Concealing investor principal within inception wallets, master wallets, and AI-generated sham wallets to fabricate transaction histories;

d. Misleading Plaintiffs by providing access to a so-called "profit wallet" that was nothing more than the residue of circular, self-referential trades;

e. Using The Eden Alliance, LLC as a front to give the appearance of legitimate investment operations while diverting funds to Defendants' control; and

f. Enabling these breaches through the legal structuring work of Peter D. Hatzipetros, who facilitated the creation and maintenance of corporate vehicles that concealed Defendants' control of investor assets.

77.    As a result of these breaches, Plaintiffs have suffered financial harm and are entitled to compensatory damages, disgorgement, and other equitable relief.

## E.  COUNT FIVE: UNJUST ENRICHMENT

78.    Plaintiffs reallege and fully incorporate the preceding paragraphs as if fully set forth herein.

79.    Defendants were unjustly enriched at the expense of Plaintiffs by acquiring, retaining, and utilizing their cryptocurrency assets under false pretenses.

80.    It would be inequitable and unjust for Defendants to retain the benefits obtained through this misconduct without returning them to those harmed.

81.    Plaintiffs are entitled to restitution and disgorgement of all funds Defendants received as a result of the fraudulent scheme, along with any profits or gains derived therefrom.

## F.  COUNT SIX: FRAUD

82.    Plaintiffs reallege and fully incorporate the preceding paragraphs as if fully set forth herein.

83.     Beginning in or about June 2024 and continuing through at least May 2025, Defendants made false representations of material fact, including but not limited to:

a.   September 2024 – Boggs emailed and texted Plaintiffs investor slide decks claiming that the "Dawn" system produced "guaranteed daily returns" of 1.5% and that investor funds "remain immovable in secure nodes." These statements were false because Defendants were not running genuine arbitrage strategies and funds were not locked in secure nodes but were instead under Boyd's unilateral control.

b.   October 22, 2024 – At Boyd's direction, Plaintiffs transferred 1.25 million USDC into wallet 0x9210…d638 with the understanding the funds would be stabilized in USDC. In reality, Boyd immediately converted them into XRP and routed them through ChangeNow and StealthEX, contrary to his express representations.

c.   December 2024 – Defendants, acting through The Eden Alliance, LLC, provided contracts representing that funds were to be pooled and traded through legitimate systems. In reality, Eden Alliance was a shell vehicle used to divert assets.

d.   January–May 2025 – Defendants represented that payments routed to Angels Coding LLC were for server hosting at Switch. On or about January 30, 2025, Intellitech LLC wired $1,199,900 USDT to Angels Coding. By May 1, 2025, at least $5,239,845 had been funneled to Angels Coding under this pretense. These statements were false because Angels Coding did not operate servers at Switch; it served as a laundering conduit.

e. Throughout late 2024, Defendants directed Plaintiffs to a so-called "profit wallet" of XRP and claimed it reflected arbitrage proceeds. In truth, it consisted of remnants of circular, AI-generated transactions designed to simulate profits.

84. Defendants knew these statements were false when made and intended Plaintiffs to rely on them. Plaintiffs reasonably relied on these misrepresentations in investing millions of dollars.

85. As a direct and proximate result, Plaintiffs suffered substantial economic damages, plus lost appreciation, investigation costs, and attorneys' fees.

## G. COUNT SEVEN: FRAUDULENT INDUCEMENT

86. Plaintiffs reallege and fully incorporate the preceding paragraphs as if fully set forth herein.

a. July 2024 – At investor meetings, Boyd and Boggs claimed that their proprietary arbitrage engine had been "audited" and had "never lost principal." These statements were false; Defendants had fabricated wallet histories to pass audits.

b. Fall 2024 – Eden Alliance contracts and communications promised that assets would be pooled safely, that returns were based on real arbitrage across exchanges, and that smart contracts would proportionally distribute profits. These were false inducements, as Defendants instead diverted funds through ChangeNow and StealthEX.

c. January–April 2025 – Defendants produced Switch-related invoices to justify ongoing capital contributions, and in connection with those invoices, funneled $1.4 million in bank wires and $3.84 million in USDT into Angels

Coding LLC. These invoices and representations were fraudulent inducements for Plaintiffs to continue funding the enterprise.

87.    Defendants made these misrepresentations with the specific intent that Plaintiffs would invest. Plaintiffs did so and were harmed as a result.

## H. COUNT EIGHT: FRAUDULENT CONCEALMENT

88.    Plaintiffs reallege and fully incorporate the preceding paragraphs as if fully set forth herein.

89.    Defendants owed Plaintiffs a duty to disclose material facts because they accepted Plaintiffs' funds for investment and undertook to manage those funds on Plaintiffs' behalf. Defendants instead concealed:

 a. That Boyd alone possessed the administrative keys to investor wallets, contrary to his representations of multi-signature security.

 b. That funds were being routed through ChangeNow and StealthEX into Privacy Tokens, eliminating transparency and traceability.

 c. That between January 30 and May 1, 2025, Intellitech Solutions, LLC's payments totaling $5,239,845 to Angels Coding were not actually for hosting fees, but rather, to directly fund Boyd and Boggs's fraud;

 d. That attorney Peter D. Hatzipetros created and maintained the shell entities Eden Alliance and Angels Coding, which were used to channel and conceal investor assets; and

 e. That Defendants fabricated the "profit wallets" as genuine trading results while concealing the fact that they were residues of circular AI-generated trades.

90.     Defendants' concealments and omissions were intended to, and did, mislead Plaintiffs into believing their assets were safe and profitably invested. Plaintiffs reasonably relied on these omissions and suffered damages as a result.

## I.    COUNT NINE: VIOLATION OF SECTION 10(b) OF THE SECURITIES EXCHANGE ACT AND RULE 10b-5

91.     Plaintiffs reallege and fully incorporate the preceding paragraphs as if set forth in full herein.

92.     Defendants James Tyler Boyd, Mike Boggs, Peter D. Hatzipetros, The Eden Alliance, LLC,   and Angels Coding LLC directly and indirectly, by use of the means and instrumentalities of interstate commerce, in connection with the purchase and sale of securities, employed devices, schemes, and artifices to defraud; made untrue statements of material fact and omitted to state material facts necessary to make the statements made not misleading; and engaged in acts, practices, and courses of business which operated as a fraud and deceit upon Plaintiffs, in violation of Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) and Rule 10b-5 (17 C.F.R. § 240.10b-5).

93.     Specifically, Defendants:

    a.    Misrepresented that Plaintiffs' investments would be converted to and held in USDC stablecoin, when in fact they were diverted into XRP and Privacy Tokens through ChangeNow and StealthEX;

    b.    Presented fabricated "profit wallets" and dashboards as proof of arbitrage returns;

    c.    Concealed the diversion of at least $5.24 million into Angels Coding LLC under the guise of Switch hosting fees;

d.  Used Eden Alliance, Angels Coding, and JPB International, LLC as shell entities to solicit and launder funds; and

e.  Omitted material facts, including Boyd's unilateral control over wallets, the role of Hatzipetros in creating shell entities, and the diversion of assets to Dawn Boggs.

f.  Defendants acted with scienter, in that they knew or recklessly disregarded that their statements and omissions were materially false and misleading. Plaintiffs reasonably relied on these misrepresentations and omissions in deciding to invest.

94.  As a direct and proximate result, Plaintiffs suffered extensive economic damages in addition to lost appreciation.

95.  Plaintiffs seek judgment awarding compensatory damages, prejudgment interest, post-judgment interest, and such other relief as the Court deems just and proper.

## J.  COUNT TEN: VIOLATION OF THE TEXAS SECURITIES ACT (TEX. REV. CIV. STAT. ART. 581-33)[5]

96.  Plaintiffs reallege and fully incorporate the preceding paragraphs as if set forth in full herein.

---

[5] Plaintiffs plead their claims for securities fraud under both federal law (Exchange Act §10(b) and Rule 10b-5) and the Texas Securities Act, Tex. Rev. Civ. Stat. art. 581-33, in the alternative. Plaintiffs do so to preserve all remedies available under both statutory frameworks. Nothing herein should be construed as an election of remedies at this stage. Plaintiffs reserve the right to pursue rescissionary damages and attorneys' fees under the Texas Securities Act, and compensatory damages under Rule 10b-5, consistent with federal and state law and the Court's determination of governing law.

97.    Defendants offered and sold securities to Plaintiffs in Texas by means of untrue statements of material fact and omissions of material fact necessary to make the statements not misleading, in violation of Article 581-33 of the Texas Securities Act.

98.    The investments sold to Plaintiffs constituted "securities" within the meaning of the Act, including investment contracts under *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946). Plaintiffs invested money in a common enterprise with the expectation of profits solely from Defendants' efforts.

99.    Defendants misrepresented and/or omitted the following material facts:

   a.    That Plaintiffs' assets would be secure and immovable in arbitrage "nodes";

   b.    That returns were based on genuine arbitrage activity rather than fabricated wallet transactions;

   c.    That contracts through Eden Alliance represented legitimate trading opportunities;

   d.    That payments to Angels Coding LLC were bona fide Switch hosting fees; and

   e.    That investor funds were not being diverted to insiders, including Dawn Boggs.

100.    Defendants acted as "sellers" and "aiders" under the Act. Boyd and Boggs directly solicited investments; Eden Alliance, Angels Coding, and JPB International, LLC received and laundered funds; Hatzipetros facilitated the creation of shell entities; and Dawn Boggs knowingly received assets traceable to investor funds.

101.    As a result, Plaintiffs are entitled to recessionary damages, including return of the consideration paid for the securities with interest thereon, less any income received, or, if Plaintiffs

no longer own the securities, damages in the amount of the consideration paid minus the value received, plus interest.

102.    Plaintiffs are further entitled to recover reasonable attorneys' fees and costs pursuant to the Texas Securities Act.

### K.  COUNT ELEVEN: CIVIL CONSPIRACY TO COMMIT FRAUD

103.    Plaintiffs reallege and fully incorporate the preceding paragraphs as if set forth in full herein.

104.    Defendants Boyd, Boggs, Hatzipetros, The Eden Alliance, LLC, Angels Coding LLC, and Dawn Boggs agreed and conspired together to commit fraud against Plaintiffs.

105.    Overt acts in furtherance of the conspiracy include, but are not limited to:

    a.  Soliciting Plaintiffs with false representations of daily arbitrage profits;

    b.  Creating and maintaining shell entities (Eden Alliance, Angels Coding) to receive and launder investor funds;

    c.  Routing over $5.2 million into Angels Coding LLC under the guise of Switch server hosting;

    d.  Generating fabricated wallets and "profit wallets" to conceal misappropriation; and

    e.  Disbursing diverted assets to Dawn Boggs and other insiders.

106.    As a result of this conspiracy, Plaintiffs suffered damages in an amount to be proven at trial.

### VI. EXEMPLARY DAMAGES

107.    Plaintiffs seek exemplary (punitive) damages in addition to actual and statutory damages. Exemplary damages are warranted where Defendants' conduct was fraudulent, malicious, oppressive, and undertaken with conscious indifference to the rights of Plaintiffs.

108.   Defendants' conduct satisfies this standard:

a. *Fraudulent Inducement and Misrepresentation*. Defendants Boyd and Boggs knowingly made false statements to Plaintiffs regarding the safety, stability, and profitability of their investments. They fabricated wallet histories, misrepresented the nature of the "profit wallets," and concealed that funds were being laundered through ChangeNow, StealthEX, and Privacy Tokens. Defendants further induced Plaintiffs to invest additional capital by presenting falsified Switch invoices and channeling more than $5.2 million into Angels Coding LLC.

b. *Fraudulent Concealment*. Defendants owed a duty to disclose material facts once they undertook to manage Plaintiffs' funds. Instead, they concealed Boyd's unilateral control over wallets, the laundering of funds through non-custodial exchanges, the role of Hatzipetros in structuring shell entities, and the diversion of millions of dollars to Angels Coding LLC and JPB International, LLC. These omissions were deliberate and calculated to deceive.

c. *Civil RICO Violations*. The pattern of racketeering activity—including wire fraud, money laundering, and use of shell entities such as The Eden Alliance, Angels Coding LLC, and JPB International, LLC—was carried out intentionally over the course of many months. The Enterprise existed for the very purpose of defrauding investors, and Defendants acted with specific intent to deceive and enrich themselves at Plaintiffs' expense.

d. *Conspiratorial Conduct*. The participation of multiple Defendants, including Dawn Boggs as a knowing recipient of investor funds, demonstrates a coordinated agreement to misappropriate and conceal assets, rather than isolated misconduct.

e. *Securities Fraud*. Defendants' conduct also constitutes securities fraud under both federal law (Section 10(b) of the Securities Exchange Act and Rule 10b-5) and the Texas Securities Act. Defendants offered and sold unregistered investment contracts by means of material misstatements and omissions, including false assurances that funds would be held in USDC stablecoin, that arbitrage systems had been audited and were profitable, and that payments to Angels Coding LLC represented legitimate hosting fees. Defendants further concealed Boyd's unilateral control over wallets, the laundering of funds through ChangeNow and StealthEX, and the diversion of over $5.2 million into Angels Coding LLC. These acts were undertaken intentionally, with knowledge of their falsity, and with the purpose of deceiving Plaintiffs into investing. Such conduct demonstrates the type of fraudulent and malicious behavior that justifies an award of exemplary damages.

109.    Because Defendants' conduct was intentional, egregious, and undertaken with willful disregard for Plaintiffs' rights, an award of exemplary damages is appropriate under applicable state law and federal law governing civil RICO.

110.    Plaintiffs therefore respectfully request that the Court award exemplary (punitive) damages in an amount sufficient to punish Defendants and deter similar misconduct, in addition to treble damages under RICO and all other relief requested herein.

## VII.    PRAYER

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendants James Tyler Boyd, Mike Boggs, Peter D. Hatzipetros, The Eden Alliance, LLC, Angels Coding, LLC, and Dawn Boggs, and against any persons or entities acting in concert with them, as follows:

### A. Damages

i.    Awarding actual damages to Plaintiffs in an amount to be determined at trial;

ii.    Awarding treble damages as permitted under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1964(c);

iii.    Awarding exemplary (punitive) damages under Texas law for Defendants' fraudulent, malicious, and grossly negligent conduct, in addition to treble damages under RICO and compensatory damages under federal securities law;

iv.    Awarding recessionary damages and attorneys' fees pursuant to the Texas Securities Act, and compensatory damages under federal securities law, in the alternative;

v.    Awarding exemplary and punitive damages in an amount sufficient to punish Defendants for their willful, wanton, and malicious conduct and to deter similar conduct in the future;

### B. Disgorgement and Restitution

i.    Ordering disgorgement of all ill-gotten gains received by Defendants, including funds traceable to accounts and assets controlled by Dawn Boggs;

    ii.    Awarding restitution for all funds wrongfully obtained by Defendants, including those funneled through The Eden Alliance, LLC and other shell entities;

## C.  Equitable Relief

    i.    Imposing a constructive trust over any assets traceable to investor funds, including those received by Dawn Boggs or held by shell entities established with the assistance of Peter D. Hatzipetros;

    ii.    Declaring that The Eden Alliance, LLC, and any other entities created or maintained by Defendants, are alter egos of the Enterprise and subject to equitable relief;

## D.  Injunctive Relief

    i.    Granting a Temporary Restraining Order pursuant to Fed. R. Civ. P. 65(b), enjoining Defendants and any person acting in concert with them from transferring, concealing, dissipating, or otherwise disposing of any digital or fiat assets in their possession, custody, or control;

    ii.    Granting a Preliminary Injunction under Fed. R. Civ. P. 65(a), maintaining the asset freeze and requiring the preservation of all cryptocurrency wallets, servers, exchange credentials, algorithmic code, nodes, and digital infrastructure relevant to the allegations in the Complaint;

    iii.    Entering a Permanent Injunction following final judgment, enjoining Defendants from engaging in further fraudulent conduct and requiring disclosure, accounting, and repatriation of all funds traceable to investor capital;

## E.  Receivership

    i.    Appointing a receiver pursuant to the Court's equitable powers and/or 18 U.S.C. § 1964(a), with authority to take possession of, manage, secure, and account for all

digital and fiat assets traceable to investor funds, including those held by The Eden Alliance, LLC and other shell entities, and to oversee forensic recovery, repatriation, and preservation of infrastructure associated with the fraudulent enterprise;

**F. Attorneys' Fees and Costs**

    i.   Awarding reasonable attorneys' fees and costs as authorized by statute, including 18 U.S.C. § 1964(c);

**G. Other Relief**

    i.   Granting such other and further relief as the Court deems just and proper.

DATED: September 19, 2025          Respectfully submitted,

                                    */s/Kyle A. Coker*
                                    Kyle A. Coker
                                    Texas Bar I.D. 24115353
                                    kyle@farmercoker.com
                                    Kaitlyn M. Coker
                                    Texas Bar I.D. 24115264
                                    kaitlyn@farmercoker.com

                                    **FARMER & COKER, PLLC**
                                    901 Main St., Ste. 5330
                                    Dallas, TX 75202
                                    Tel:    (832) 240-1047

                                    **ATTORNEYS FOR PLAINTIFFS**