**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| CORBIN COWAN, DAWN COWAN, STRATEGIC EQUITY PARTNERS, LLC, TRIUMPH TECHNOLOGIES, LLC, CAB VENTURES, LLC, JEREMY ENGEL, SPARTAN MARKETING & INVESTMENTS, LLC, INTELLITECH SOLUTIONS, LLC, SOLIDA EQUITY PARTNERS, LLC, JOSH KIRK, JUSTIN ANDERSON, JARED GULLER, QUANTUM LIFE ENTERPRISES, LLC,  RAINY DAZE, LLC, and SIMPLE DAZE, LLC, | § § § § § § § § § § § § § § § | |
| *Plaintiffs,* | § § | |
| v. | § § | CIVIL ACTION NO. 4:25-cv-04476 |
| JAMES TYLER BOYD, MIKE BOGGS, PETER D. HATZIPETROS, THE EDEN ALLIANCE, LLC, and ANGELS CODING, LLC, | § § § § § | |
| *Defendants.* | § | |

**PLAINTIFFS' FIRST AMENDED COMPLAINT**

TO THE HONORABLE JUDGE OF SAID COURT:

COME NOW, Plaintiffs Corbin Cowan, Dawn Cowan, Strategic Equity Partners LLC,

Triumph Technologies LLC, CAB Ventures, LLC, Jeremy Engel, Spartan Marketing &

Investments LLC, Intellitech Solutions, LLC, Solida Equity Partners, LLC, Josh Kirk, Justin

Anderson, Jared Guller, Quantum Life Enterprises, LLC, Rainy Daze, LLC, and Simple Daze,

LLC and file this First Amended Complaint of and against Defendants James Tyler Boyd, Mike

Boggs, Peter D. Hatzipetros, The Eden Alliance, LLC, and Angels Coding, LLC, and, for cause, would respectfully show as follows:

## I.  INTRODUCTION

1.      This case is about deception, exploitation, and digital theft on a global scale. Defendants James Tyler Boyd and Mike Boggs, in conspiracy with Peter Hatzipetros, orchestrated an elaborate cryptocurrency fraud scheme under the guise of a proprietary trading platform that promised daily returns and ironclad security. What they delivered instead was a technologically concealed Ponzi operation: one designed to mislead investors, misappropriate millions in digital assets, and erase all trace of wrongdoing behind layers of blockchain obfuscation.

2.      Plaintiffs are several investors who placed trust, technology, and capital in the hands of Defendants. Like others, they were shown sophisticated dashboards, flown to Las Vegas for high-end demonstrations, and told that their funds were safe within impenetrable blockchain "nodes." The truth was very different: funds were diverted, code was altered, trading logs were falsified, and money was routed through anonymous exchanges and circular wallets.[1] Behind the polished façade was a system built to conceal, not trade.

3.      When the operation finally began to unravel, Boyd turned himself in to federal authorities, reportedly admitting to running an "international Ponzi scheme." But the damage was done. Millions in cryptocurrency remain missing. The infrastructure behind the platform, including servers, nodes, and security keys, is fractured, inaccessible, and compromised. And the victims, ordinary people misled by false assurances and high-tech smoke screens, are left without answers or recourse.

---

[1] A "wallet" refers to a unique blockchain address (software or hardware) that can hold and transfer cryptocurrency, functionally comparable to a bank account number.

4.      Plaintiffs bring this action to recover wrongfully taken assets, unwind the fraudulent enterprise, and hold accountable those who engineered and profited from the deception.

## II. PARTIES

1.      Plaintiff Corbin Cowan is an individual domiciled in Oklahoma.

2.      Plaintiff Dawn Cowan is an individual domiciled in Oklahoma.

3.      Strategic Equity Partners LLC is an Oklahoma limited liability company. Its members are domiciled in the State of Oklahoma.

4.      Triumph Technologies LLC is a Wyoming limited liability company. Its member is domiciled in the State of Oklahoma.

5.      CAB Ventures, LLC is a Wyoming limited liability company. Its member is domiciled in the State of Oklahoma.

6.      Spartan Marketing & Investments LLC is a Virginia limited liability company. Its members are domiciled in the State of Virginia.

7.      Plaintiff Intellitech Solutions, LLC is a Wyoming limited liability company, and its members are domiciled in Montana and Utah.

8.      Plaintiff Solida Equity Partners, LLC is a Delaware limited liability company with its principal place of business outside the State of Texas. Its members are residents of Texas and Florida.

9.      Plaintiff Jeremy Engel is an individual resident of Texas and is domiciled in Montgomery County, Texas.

10.     Plaintiff Josh Kirk is an individual resident of Texas and is domiciled in Montgomery County, Texas.

11.     Plaintiff Justin Anderson is an individual resident of Utah.

12.     Plaintiff Jared Guller is an individual resident of Utah.

13.     Plaintiff Quantum Life Enterprises, LLC is a Utah limited liability company.

14.     Plaintiff Rainy Daze, LLC is Utah limited liability company.

15.     Plaintiff Simple Daze, LLC is a Utah limited liability company.

16.     Defendant James Tyler Boyd is an individual resident of Henderson, Nevada, who operated and controlled the "D.A.W.N.N." trading system and associated infrastructure, directed investor solicitations, controlled wallets, executed fraudulent transactions, and laundered investor funds through non-custodial exchanges (ChangeNOW and StealthEX), through AI-generated wallet flows, and via a fabricated "profit wallet." He may be served at his last known business address located at 7544 Arroyo Crossing Parkway, Suite 246, Las Vegas, Nevada 89113.

17.     Defendant Mike Boggs is an individual resident of Pennsylvania co-solicited investors, designed and provided algorithmic trading logic, set up (or directed to be set up) the inception and master wallets, and assisted in fabricating the performance and transaction histories shown to investors. Defendant may be served at his last known address, 7712 Main Road, Bedford, PA 15522.

18.     Defendant Peter D. Hatzipetros is an attorney who, at all relevant times, held himself out to investors as a "Partner / General Counsel" of QuantumArc International LLC ("QuantumArc"), an entity used by Defendants to operate and promote the cryptocurrency arbitrage investment program described herein. Upon information and belief, Hatzipetros participated in the structuring of entities used by the enterprise and in communications with investors concerning the operation of the program and the purported recovery of investor funds.

19.     Defendant The Eden Alliance, LLC is a California limited liability company, with its principal business address at 1968 S. Coast Hwy, Suite #000, Laguna Beach, CA 92651; mailing address 1411 Cedar Terrace, Columbia, SC 29209; registered agent James T. Boyd. The Eden

Alliance, LLC has been used by Defendants to solicit investments, hold or pool investor funds, and facilitate the fraudulent arbitrage and laundering scheme under the "D.A.W.N.N." / "Eden" systems. The Eden Alliance, LLC may be served by and through its registered agent, James T. Boyd, at 1968 S. Coast Hwy, Suite #000, Laguna Beach, CA 92651.

20.     Defendant Angels Coding, LLC is a Pennsylvania limited liability company with its principal place of business located at 7712 Main Road, Bedford, PA 15522. Its registered agent for service of process is Michael Boggs at the same address. Angels Coding LLC has been used as a vehicle by Defendants to receive, conceal, and transfer investor funds as part of the fraudulent enterprise alleged herein.

### III.JURISDICTION & VENUE

21.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the claims arise under federal law, including the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968. The Court also has supplemental jurisdiction over related state law claims pursuant to 28 U.S.C. § 1367.

22.     This Court has personal jurisdiction over Defendant James Tyler Boyd because he purposefully directed fraudulent activity toward the State of Texas. Boyd solicited investments from Texas residents, including Plaintiff Josh Kirk, and knowingly accepted substantial funds transmitted from Texas financial institutions. Boyd used those Texas-based investor funds to acquire and configure servers hosted in Las Vegas, Nevada, which were instrumental in operating the fraudulent algorithmic trading system at the core of this scheme. These servers were paid for, in whole or in part, using capital sourced from Texas residents and the servers themselves were sent to Defendants, at Defendants' request, from Texas.

23.     This Court has personal jurisdiction over Defendants under 18 U.S.C. § 1965(b), which provides for nationwide service of process in civil RICO actions where "the ends of justice"

so require. Venue is proper in this District as Defendants are alleged to have acted in concert with each other in the operation of a coordinated enterprise to defraud investors. The ends of justice require that all members of the RICO enterprise be brought before this Court to ensure comprehensive adjudication of the claims and uniform relief to affected investors.

24.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to the claims occurred in this District. Plaintiff Josh Kirk resides in this District, received representations from Defendants while located in Texas, and wired funds from Texas to accounts and systems ultimately controlled by Defendants. Additionally, the server infrastructure central to the scheme was funded using money transmitted from Texas, and Defendants' actions caused foreseeable injury to Texas residents.

## IV. FACTUAL BACKGROUND

25.     This case arises from a coordinated, high-tech fraud scheme in three interrelated phases: the investment solicitation, the operation of the scheme, and the eventual unraveling of the enterprise.

### A. The Investment Phase

26.     Beginning in or around mid-2024, Defendants James Tyler Boyd and Mike Boggs began soliciting substantial cryptocurrency investments from individuals across the United States, including Plaintiffs Josh Kirk and Jeremy Engel, both residents of Texas. Boyd and Boggs represented that investor funds would be deployed into a sophisticated cryptocurrency arbitrage trading system capable of generating consistent daily profits through automated trading across multiple digital asset exchanges.

27.     Defendants represented that the trading system (referred to as "D.A.W.N.N.", purportedly standing for Distributed Arbitrage with Neuro Networks) was a proprietary artificial-intelligence-driven arbitrage engine capable of simultaneously monitoring and executing trades

across as many as fifty cryptocurrency exchanges. According to Defendants, the system analyzed price discrepancies between exchanges and executed rapid arbitrage transactions that produced reliable daily returns with minimal risk.

28.    To promote the investment opportunity, Defendants staged elaborate presentations designed to convey technological sophistication and financial success. Prospective investors were flown to Las Vegas via chartered private aircraft and invited to attend in-person demonstrations of the purported trading platform. During these events, Defendants displayed servers, computer nodes, and other hardware intended to demonstrate the existence of a powerful and secure trading infrastructure.

29.    Defendants represented to investors that funds deposited into the system would be secured through a network of blockchain-based "nodes" that stored liquidity across distributed wallets. Investors were told that these nodes were protected through multiple authentication layers and that no single person could access or move investor funds without specialized security credentials. Defendants further represented that certain investors would receive physical node devices or authentication chips, and that without these devices withdrawals could not occur.

30.    In or around January 2025, Defendants circulated and relied upon a document entitled the "QuantumArc Node System User Agreement," which Defendants used in soliciting certain investors through QuantumArc International LLC, and which purported to govern participation in the cryptocurrency arbitrage investment program operated through QuantumArc International LLC ("QuantumArc"). The document identifies Defendant Peter D. Hatzipetros as the individual who prepared the agreement and reflects his role as "Partner / General Counsel."

31.    The QuantumArc User Agreement describes an investment structure in which participants would deposit cryptocurrency or fiat currency into digital wallets controlled by

Defendants. According to the agreement, those funds would then be deployed through automated arbitrage trading strategies across various cryptocurrency exchanges and decentralized finance platforms, with profits purportedly shared between QuantumArc and participating investors. The document further reflects that Hatzipetros held himself out as both a partner and legal architect of the enterprise, lending credibility to Defendants' representations that the investment program was legitimate and professionally managed.

32.     In March 2025, several investors, including representatives of certain Plaintiffs, traveled to Las Vegas, Nevada, where Defendants hosted in-person meetings at the Red Rock Canyon Hotel and Spa to further promote the investment program. During these meetings, Defendants again presented the D.A.W.N.N. trading system and described the arbitrage platform as a highly secure, automated system capable of producing predictable profits through continuous cross-exchange trading activity.

33.     During these Las Vegas presentations, Defendants introduced members of the enterprise to investors, including James Tyler Boyd, Mike Boggs, and Peter D. Hatzipetros. Hatzipetros was presented to investors as the attorney and partner associated with the venture, reinforcing Defendants' representations that the investment program had been structured with legal oversight and institutional safeguards.

34.     Defendants also represented that the system's core trading functionality relied on a proprietary algorithm and tunneling logic developed by Boggs. According to Defendants, this technology continuously analyzed market price discrepancies and executed arbitrage trades in real time, producing consistent daily returns while ensuring that each arbitrage cycle generated profit.

35.     Defendants further represented that investor funds would be pooled and managed through entities associated with the enterprise, including QuantumArc International LLC and The

Eden Alliance, LLC, which Defendants described as operational vehicles responsible for administering the arbitrage platform and managing investor capital. Through Eden's entity structure, Defendants represented that investor funds would be securely pooled, deployed into the trading system, and returned to investors with profits generated through arbitrage activity.

36.    Relying on these representations, investors were assured that their capital was safe and protected by multiple technological safeguards. Several investors, including some who ultimately invested $5 million or more, were told that their funds could not be accessed without multiple authentication layers and that the system's distributed node architecture prevented unauthorized withdrawals. At least one investor was told that a physical node device had been mailed to them for safekeeping and that without that device withdrawals could not occur.

37.    In reliance on Defendants' representations regarding the D.A.W.N.N. arbitrage system, the security of the node infrastructure, and the legitimacy of the Eden and QuantumArc investment structure, Plaintiffs entrusted substantial sums of money to Defendants during the investment phase of the scheme.

38.    The following chart reflects the principal amounts invested by each Plaintiff:

| PLAINTIFF | AMOUNT INVESTED |
|---|---|
| Corbin Cowan | $750,000.00 |
| Dawn Cowan | $3,251,222.48 |
| Strategic Equity Partners LLC | $154,642.72 |
| CAB Ventures, LLC | $753,917.62 |
| Triumph Technologies, LLC | $445,000.00 |
| Solida Equity Partners, LLC | $224,955.00 |
| Spartan Marketing & Investments, LLC | $4,921,900.00 |
| Intellitech Solutions, LLC | $5,239,845.00 |
| Jeremy Engel | $10,480,742.00 |
| Josh Kirk | $6,823,051.00 |
| **Total** | **$33,045,275.82** |

**B.  The Operation of the Scheme**

39.     After securing investor funds, Defendants represented that those funds had been deployed into the proprietary cryptocurrency arbitrage system previously described. According to Defendants, the system operated through a distributed network of blockchain-based "nodes" connected to numerous cryptocurrency exchanges. Through this network, the platform purportedly executed rapid arbitrage trades designed to capture price discrepancies across markets.

40.     Defendants directed investors to deposit cryptocurrency into specific digital wallet addresses designated by the enterprise. These wallets were represented as entry points into the arbitrage system, through which investor capital would be pooled and deployed into trading activity. One such wallet address used for investor deposits was: TWdD7eKphXDv3NryqJxi4c4N6PcN3RnQwq.

41.     Blockchain records reflect that substantial cryptocurrency transfers were made into wallets designated by Defendants. For example, one transaction transferring approximately $370,000 in cryptocurrency was recorded on the blockchain under the following transaction identifier: 3b643b3ba09e3d28d130c0f5288da2977461fa4519b99bbf6a0a5aee0c1ee116.

42.     Defendants represented that such transfers constituted capital contributions into the arbitrage system and that the deposited assets would be deployed through automated trading activity.

43.     Defendants further represented that investor capital was deployed through individual "nodes" associated with specific blockchain wallets. Investors were provided with access to node addresses and were told that these nodes would generate arbitrage returns through automated trading across multiple cryptocurrency exchanges.

44.     For example, Defendants provided investors with access to an XRP pooling wallet, through which they could purportedly observe arbitrage activity: https://xrpscan.com/account/rhdrCUMoZw4Cm6VHRuoEnuvwPPTkcKDE6M.

45.     Defendants represented that this node periodically generated deposits reflecting profits from arbitrage trading activity. Investors were told that these deposits occurred approximately every 20 to 28 hours, reflecting the completion of arbitrage trading cycles executed across multiple exchanges.

46.     Defendants later represented that the enterprise was expanding the arbitrage platform by deploying additional nodes across multiple cryptocurrency networks. According to Defendants, these nodes operated on networks including XRP, Litecoin (LTC), Dogecoin (DOGE), and Monero (XMR).

47.     Defendants identified additional wallet addresses as part of this expanding arbitrage infrastructure. For example, Defendants represented that the following wallets corresponded to newly deployed nodes within the system:

   a.   DOGE Wallet: DLwbZAjSBG49UaVg9HwuGgfYg7giLYc6m1

   b.   XMR Wallet:

        8764iMpoGwe2pk9pYe7HKAMhNRbietuU7EurDJKAQBgc17bbxnTe8m

        NiZeBHR64xUCFFKsfHciLvCfxBx8PZy5YSCFnKBxq.

48.     To reinforce the appearance that the system was functioning as represented, Defendants provided investors with access to an online dashboard interface designed to display node activity, arbitrage performance, and withdrawal requests. These dashboards were accessible through web interfaces controlled by Defendants, including sites hosted at addresses such as: http://qle.vercel.app.

49.     Through these dashboards, Defendants represented that the arbitrage nodes were actively generating returns and that investor balances were increasing through ongoing trading activity.

50.     Defendants further represented that the arbitrage system periodically required maintenance periods or network upgrades that could temporarily slow or pause trading activity. During these periods, Defendants assured investors that the system remained operational and that performance would resume once upgrades were completed.

51.     When investors sought to withdraw funds from the platform, Defendants repeatedly represented that withdrawals would be processed through the dashboard interface or through automated blockchain transactions associated with the node infrastructure.

52.     Despite these representations, withdrawal requests were frequently delayed or left unfulfilled. Defendants attributed these delays to technical issues, including blockchain congestion, system upgrades, node synchronization processes, and other purported operational limitations.

53.     As time progressed, investors were increasingly unable to obtain withdrawals of their funds. Defendants continued to provide explanations for the delays and represented that the system would soon resume normal operation.

54.     Ultimately, however, the arbitrage platform ceased functioning as represented, and Defendants failed to return substantial amounts of investor funds entrusted to the enterprise.

## C.  The Hidden Fraud Infrastructure

55.     Contrary to the representations made to investors, the arbitrage platform did not operate solely through the visible trading infrastructure described to Plaintiffs. Instead, information obtained after the collapse of the scheme revealed that Defendant James Tyler Boyd maintained

control over a concealed layer of system infrastructure that operated in parallel to the platform presented to investors and developers.

56.     The visible system (consisting of the dashboards, node displays, and transaction flows shown to investors) functioned primarily as a front-end environment designed to create the appearance of legitimate arbitrage trading activity. Behind that visible layer, Boyd maintained a hidden backend architecture through which investor funds could be rerouted through unmonitored wallets, obscured transaction paths, and concealed liquidity channels. This concealed infrastructure enabled Boyd to manipulate the movement of digital assets while preventing investors and developers from observing the true behavior of the system.

57.     Defendant Mike Boggs, who had originally developed portions of the system's backend trading logic, created the algorithmic framework internally referred to as the "tunneler." This code was designed to support automated trading functionality within the platform. Boggs provided the source code to Boyd for integration into the trading system.

58.     After integrating the tunneler code into the system, Boyd modified and branched the codebase. Although Boggs initially verified that his source code was active within the system environment, Boyd implemented additional modifications that enabled the concealed infrastructure to operate outside the visible trading layer. These modifications allowed Boyd to conduct operations beneath the portions of the system that were accessible to developers or visible through the investor dashboards.

59.     Boyd further reinforced the concealment of these operations through the use of simulated authentication and security controls. Investors and developers were presented with interfaces that appeared to require secure authentication protocols, including two-factor authentication ("2FA") mechanisms and hardware security module ("HSM") integrations. In

reality, these controls were either simulated or incomplete, allowing Boyd to maintain unilateral control over the system's core infrastructure and wallet activity while giving the false impression that the system operated with institutional-grade security safeguards.

60.     As part of this concealed infrastructure, Defendants also generated large networks of blockchain wallets that did not correspond to legitimate trading counterparties. Instead, these wallets were created through automated processes that produced thousands of blockchain addresses which transferred cryptocurrency among themselves in rapid succession. These automated transfers created extensive transaction histories that appeared, when viewed through public blockchain explorers, to reflect active arbitrage trading across multiple exchanges.

61.     In reality, these transactions were circular and self-referential, meaning that cryptocurrency was repeatedly transferred among wallets controlled by the enterprise without generating legitimate profit. Because blockchain explorers display transaction histories without revealing the true ownership of wallet addresses, these circular transfers created the illusion that the system was engaging in legitimate trading activity with external counterparties.

62.     Defendants also directed investors to a purported "profit wallet," which was presented as evidence that the arbitrage system was generating returns. In truth, this wallet consisted largely of the residual balances left over from the thousands of circular transactions generated within the wallet network. These remnants were falsely represented to investors as accumulated arbitrage profits.

63.     The scheme further incorporated additional techniques designed to obscure the true movement of investor funds. These included transaction dusting, in which large transfers were divided into numerous smaller transactions across many wallets; circular trading, in which cryptocurrency was repeatedly transferred through intermediary wallets and returned to a central

liquidity address; and liquidity recycling, in which the same assets were repeatedly circulated through the system to simulate ongoing trading activity.

64.    Forensic analysis of the blockchain activity associated with the enterprise later revealed patterns consistent with these techniques. For example, analysis of XRP wallet flows identified a recurring circular trading pattern in which more than 247,000 XRP passed through a central liquidity address that also served as the largest contributor to its own inflows: an indicator that the address was effectively recycling its own funds to simulate trading activity.

65.    A comparable pattern was identified within the Litecoin blockchain, where more than 107,000 transactions were routed through a small group of intermediary wallets before ultimately converging at a single liquidity destination. The structure of these transactions, combined with the use of dust transfers and wallet separation, was consistent with a deliberate effort to frustrate tracing and conceal the true origin and destination of funds.

66.    Defendants also deployed smart contracts and decentralized finance ("DeFi") mechanisms designed to further obscure asset movements. These included time-locked contracts[2], administrative backdoors,[3] and intentionally flawed withdrawal logic that allowed Defendants to maintain control over funds while giving the appearance of automated distribution mechanisms. Contracts deployed on networks including Ethereum and Avalanche incorporated hidden control functions that enabled Defendants to manipulate contract behavior without detection by investors.

---

[2] A "time-locked contract" is a smart contract designed to hold assets until a present future time; if tampered with, funds can be released prematurely.

[3] A "backdoor function" refers to a hidden programming code within a smart contract that allows its creator to override stated rules and withdraw funds unilaterally.

67.    DeFi protocol positions[4] associated with the enterprise were also identified on platforms such as Curve, Uniswap, Compound, and Aave, where liquidity positions and token flows were linked to accounts tied to Defendants. Investigators later identified smart contracts that contained flawed access controls and timestamp manipulation features designed to conceal recoverable assets and complicate forensic tracing.

68.    Through these combined mechanisms, including concealed infrastructure, fabricated transaction histories, automated wallet networks, and manipulated smart contracts, Defendants were able to create the appearance of a functioning arbitrage trading platform while maintaining hidden control over investor funds and concealing the true nature of the enterprise's operations.

**D.  Laundering of Investor Funds**

69.    Once investor funds were routed through the concealed infrastructure described above, Defendants undertook additional steps to obscure the origin, movement, and ultimate destination of those assets. Through a combination of cryptocurrency conversion services, intermediary wallets, and decentralized finance protocols, Defendants transferred investor funds through a series of transactions designed to conceal their control over the assets and to frustrate tracing efforts.

70.    One mechanism used to obscure these transfers involved the use of cryptocurrency exchange and swap services that allow users to convert digital assets without maintaining a traditional custodial account. Services such as ChangeNOW were used to exchange one cryptocurrency for another while routing the transaction through multiple intermediary wallets. By

---

[4] A "DeFi" position is a deposit, loan, or liquidity stake held in a decentralized-finance protocol (*e.g.*, Aave, Curve, Uniswap) to earn yield or facilitate trading.

repeatedly converting assets through such services, Defendants were able to move investor funds between blockchains and wallet addresses while obscuring the original source of those funds.

71.     Defendants also used cryptocurrency swap services such as StealthEX, which permits users to exchange digital assets without requiring customer accounts or identifying information. Through these services, Defendants converted investor funds into various cryptocurrencies, including privacy-enhanced tokens, before routing them through additional wallets under their control. These conversions further complicated tracing efforts by fragmenting the transaction history across multiple blockchain networks.

72.     In addition to these exchange-based transfers, Defendants moved cryptocurrency through networks of intermediary wallets that separated incoming funds from outgoing transactions. These intermediary wallets functioned as temporary holding addresses that allowed Defendants to fragment large transfers into numerous smaller transactions before consolidating those assets into new wallets. This process, sometimes referred to as "dusting" or transaction splitting, created extensive blockchain activity while obscuring the path of funds through the system.

73.     Defendants also routed portions of investor funds through entities and accounts associated with the enterprise's operational infrastructure. For example, funds connected to the enterprise were transferred to accounts associated with Angels Coding, an entity represented to investors as providing development or technical services for the trading platform. These transfers were represented as legitimate business expenses related to system development and hosting infrastructure.

74.     Similarly, Defendants represented that certain expenditures were necessary to support the operation of the arbitrage system's hosting environment. Investors were told that the

platform relied on specialized infrastructure hosted through third-party providers, including systems associated with Switch, a technology infrastructure company known for operating high-security data centers in Las Vegas. These explanations were used to justify transfers of funds purportedly required to maintain or expand the system's technical infrastructure.

75.    In reality, these transfers formed part of the broader scheme through which investor funds were dispersed across multiple wallets, exchanges, and entities associated with Defendants. By repeatedly transferring assets through intermediary wallets, converting them across different cryptocurrencies, and routing them through services designed to obscure transaction paths, Defendants were able to conceal the true destination of substantial portions of investor funds.

76.    Blockchain analysis conducted after the collapse of the enterprise revealed that these transfers formed part of a coordinated pattern of asset movement designed to frustrate tracing efforts. Funds originating from investor deposits were routed through multiple exchanges and swap services before being transferred into wallets not disclosed to investors and not associated with the purported arbitrage trading system.

77.    Through these laundering mechanisms, Defendants were able to move large amounts of cryptocurrency out of the investment platform while maintaining the appearance—through dashboards, wallet displays, and fabricated transaction histories—that investor funds remained deployed within the arbitrage trading system.

## E.  Collapse and Discovery of the Scheme

78.    As time progressed, investors increasingly sought to withdraw funds from the arbitrage platform. Defendants continued to represent that withdrawals would be processed through the node infrastructure and the dashboard interface previously provided to investors. Despite these assurances, withdrawal requests were repeatedly delayed or left unfulfilled.

79.     When investors pressed for explanations, Defendants attributed the delays to a variety of purported technical issues. These explanations included claims of blockchain congestion, system upgrades, node synchronization problems, and infrastructure maintenance. Investors were repeatedly told that the system remained operational and that withdrawals would resume once the alleged technical issues were resolved.

80.     Over time, however, it became apparent that Defendants were unable or unwilling to process investor withdrawals. Requests for the return of funds went unanswered or were met with shifting explanations regarding the status of the platform and the availability of liquidity.

81.     In the aftermath of the platform's failure, information began to emerge regarding the internal structure of the enterprise and the true control of investor funds. At one point during the unraveling of the scheme, Defendant James Tyler Boyd turned himself in to federal authorities in connection with the activities of the enterprise.

82.     Following Boyd's surrender, Defendant Mike Boggs provided conflicting explanations to investors regarding the cause of the platform's collapse. Boggs suggested that Boyd had exercised unilateral control over the system infrastructure and that Boyd's actions had caused the failure of the enterprise. These explanations, however, did not account for the broader structure of the scheme or the extensive infrastructure that had been presented to investors during the solicitation and operation of the platform.

83.     As investors attempted to determine the location of their funds, forensic analysis of blockchain transactions and system activity began to reveal the concealed infrastructure described above. Investigators identified patterns of circular transactions, automated wallet generation, and concealed transaction routing that were inconsistent with legitimate arbitrage trading activity.

84.     Additional analysis revealed that significant portions of investor funds had been transferred through cryptocurrency conversion services, intermediary wallets, and decentralized finance protocols before ultimately being routed to wallets not associated with the arbitrage platform described to investors. These findings confirmed that the system presented to investors had not been operating as represented.

85.     During this same period, investors also encountered difficulties accessing the technical infrastructure that Defendants had previously represented was necessary to manage and monitor the arbitrage system. Certain servers, dashboards, and system interfaces previously used to display trading activity became inaccessible or ceased functioning entirely, further complicating efforts to determine the location of investor assets.

86.     As the scheme continued to unravel, Defendant Peter D. Hatzipetros communicated with investors regarding the status of the enterprise and the possibility of recovering funds. In these communications, Hatzipetros represented that Defendants were pursuing potential transactions involving the sale of enterprise assets to third parties and that such transactions could result in partial recovery of investor losses.

87.     These communications included representations that Defendants had received letters of intent from potential purchasers interested in acquiring assets associated with the enterprise. Investors were told that such transactions could result in a percentage-based recovery of invested funds once negotiations were completed.

88.     Despite these representations, substantial investor funds remained unaccounted for. The arbitrage platform described by Defendants ceased operating, and the infrastructure presented to investors as the foundation of the trading system proved to be inconsistent with the representations made during the investment phase of the scheme.

89. Through the conduct described above, Defendants induced Plaintiffs and other investors to contribute more than $33 million to what was represented as a secure and technologically sophisticated cryptocurrency arbitrage platform. In reality, the enterprise operated as a coordinated scheme in which investor funds were routed through concealed infrastructure, obscured through complex transaction networks, and ultimately misappropriated.

## V.  CLAIMS

### A.  COUNT ONE: VIOLATION OF RICO (18 U.S.C. § 1962(c)) (Conducting the Affairs of an Enterprise Through a Pattern of Racketeering Activity)

90. Plaintiffs reallege and incorporate by reference paragraphs 1-45 of the Complaint and the Factual Background.

91. Defendants James Tyler Boyd, Mike Boggs, Peter D. Hatzipetros, and The Eden Alliance, LLC (the "RICO Persons") are each a "person" within the meaning of 18 U.S.C. § 1961(3).

92. Beginning no later than June 2024 and continuing through at least July 2025, Boyd, Boggs, Hatzipetros, and The Eden Alliance, LLC associated together, along with various shell entities in an association-in-fact enterprise (the "Boyd–Boggs–Eden Enterprise") within the meaning of 18 U.S.C. § 1961(4).

93. The Enterprise had an ongoing structure and purpose: (a) to solicit cryptocurrency "investments" under false pretenses, (b) to divert those assets to wallets exclusively controlled by Boyd and Boggs, (c) to launder the proceeds through anonymous, non-custodial exchanges such as ChangeNOW and StealthEX, (d) to conceal the diversion by fabricating transaction histories, "profit wallets," and sham arbitrage dashboards, and (e) to use corporate entities - including The Eden Alliance, LLC, structured and maintained with assistance from attorney Peter D. Hatzipetros, who also held himself out to investors as "Partner / General Counsel" of QuantumArc International

LLC and drafted the QuantumArc Node System User Agreement used to structure and promote the investment program. Hatzipetros further contributed to the enterprise's structure by preparing legal documentation used to formalize the investment program and by presenting himself to investors as a partner of the venture during in-person meetings promoting the platform.

94.     The Enterprise was separate and distinct from the racketeering acts described below; it maintained dedicated servers, wallet clusters, and exchange accounts, and it continued to exist after individual fraudulent transactions were completed.

95.     Boyd directed the technical infrastructure of the Enterprise by configuring concealed servers, maintaining administrative keys, and singlehandedly controlling multisignature wallets. Boggs directed investor solicitation and algorithm design by drafting offering materials, pitching the proprietary "D.A.W.N.N." and "Eden" arbitrage engines, and providing the code that Boyd later branched and weaponized. Hatzipetros facilitated the creation and use of corporate entities (including The Eden Alliance, LLC and QuantumArc International LLC) through which investor funds were solicited and routed, and drafted legal documentation used to structure the investment program. The Eden Alliance, LLC itself served as a corporate vehicle through which investor money was solicited, received, pooled, and diverted.

96.     Hatzipetros participated in the operation and management of the enterprise by, among other things, serving as the enterprise's "Partner / General Counsel," drafting and preparing legal documentation used to structure the investment program, including the QuantumArc Node System User Agreement, appearing at investor meetings where he was introduced as a partner of the venture, and communicating with investors regarding the enterprise's activities and the purported recovery of investor funds…By holding himself out as a partner and legal architect of

the enterprise, Hatzipetros lent credibility to Defendants' representations to investors and furthered the enterprise's ability to solicit and retain investor funds.

97.    Each Defendant therefore conducted or participated, directly or indirectly, in the operation or management of the Enterprise's affairs.

98.    The Boyd–Boggs–Eden Enterprise engaged in multiple acts of wire fraud (18 U.S.C. § 1343) and money laundering (18 U.S.C. § 1956), including, but not limited to, the following exemplar acts:

- July 8, 2024: Boggs emailed Plaintiff Josh Kirk from m.boggs@—.com attaching a slide deck that falsely represented daily returns of "1.5 % guaranteed" and claimed that investor funds "remain immovable in secure nodes." The email was transmitted via interstate wires from Pennsylvania to Texas.

- October 22, 2024: At Boyd's instruction, Plaintiff Josh Kirk wired 1,250,000 USDC from a wallet in Texas to Enterprise wallet 0x9210…d638 on the Ethereum network. Within hours, Boyd fragmented the funds through twelve "dust" transfers, then routed the bulk to ChangeNOW, falsely representing that they would be stabilized in stablecoins such as USDC or USDT. Instead, Boyd converted them into XRP and immediately funneled them through StealthEX, exchanging into Privacy Tokens designed to defeat regulatory oversight.

- December 2024: Using The Eden Alliance, LLC as the front-facing entity, Defendants solicited additional investor funds through contracts signed under Eden's name, funneled those assets into inception and master wallets, and laundered them through ChangeNOW and StealthEX in the same manner.

- March 2025: Defendants provided Plaintiffs with a link to an XRP wallet purportedly reflecting arbitrage proceeds. In reality, the wallet consisted of accumulated remnants of thousands of sham AI-generated transactions, designed to create the illusion of profitability and induce additional investment.

- January–May 2025: Intellitech LLC wired $1.4 million and transferred $3.84 million in USDT to Angels Coding LLC, ostensibly for server hosting at Switch. These transactions were, on information and belief, funded with investor assets and served as a laundering mechanism for the Enterprise.

99.     These acts are related (they share the same perpetrators, methods, and illicit purpose) and exhibit closed-ended continuity, spanning more than a year and comprising hundreds of discrete wire transmissions and laundering acts.

100.     As a direct and proximate result of the pattern of racketeering activity, Plaintiffs have been deprived of no less than $5 million in digital assets, exclusive of lost appreciation, and continue to suffer ongoing investigative and mitigation expenses. The injuries flowed directly from Defendants' fraudulent wires and laundering activities; but for the misrepresentations and diversion, Plaintiffs' cryptocurrency would have remained in their possession.

101.     Plaintiffs seek judgment against Defendants for treble damages under 18 U.S.C. § 1964(c), reasonable attorney's fees and costs, prejudgment interest, and such other relief as the Court deems just and proper.

**B. COUNT TWO: VIOLATION OF 18 U.S.C. § 1962(d) (RICO Conspiracy)**

102.     Plaintiffs reallege and fully incorporate the preceding factual allegations as if set forth in full herein.

103.     Defendants James Tyler Boyd, Mike Boggs, Peter D. Hatzipetros, Angels Coding, LLC, and The Eden Alliance, LLC knowingly agreed to facilitate the conduct of the Boyd–Boggs–

Eden Enterprise through the pattern of racketeering detailed herein. Each Defendant understood the scope of the unlawful scheme and joined in it to achieve its fraudulent purpose.

104. Overt acts in furtherance of the conspiracy include, inter alia:

   a. Drafting and circulating false investment term sheets (June 2024);

   b. Chartering a Gulfstream jet to transport investors to staged demonstrations in Las Vegas (September 2024);

   c. Retaining attorney Peter D. Hatzipetros to structure and register shell entities, including The Eden Alliance, LLC, in order to house investor funds and provide an appearance of legitimacy (Summer 2024);

   d. Using The Eden Alliance, LLC to solicit and contract with investors under the guise of legitimate arbitrage operations (Fall 2024);

   e. Routing investor funds through ChangeNOW and StealthEX to exchange principal into Privacy Tokens (October 2024 through mid-2025); and

   f. Transferring investor funds into accounts controlled by Dawn Boggs for her personal use and benefit (Winter 2024–Spring 2025).

105. Each Defendant thus conspired to violate § 1962(c) and is jointly and severally liable for the resulting damages.

106. Plaintiffs seek the same monetary and equitable relief described in Count One, together with all additional relief the Court deems equitable to redress the conspiracy.

### C. COUNT THREE: CONVERSION

107. Plaintiffs reallege and fully incorporate by reference the preceding paragraphs as if fully set forth herein.

108.    Defendants Boyd, Boggs, Hatzipetros, and The Eden Alliance, LLC wrongfully exercised dominion and control over cryptocurrency and other digital assets that rightfully belonged to Plaintiffs.

109.    Defendants intentionally retained, transferred, and used those assets in a manner inconsistent with Plaintiffs' rights, including by:

      a.  Routing Plaintiffs' assets through ChangeNOW under the false pretense that they were being stabilized in stablecoins such as USDC or USDT, when in reality they were converted into XRP for further concealment;

      b.  Using StealthEX to exchange XRP into Privacy Tokens, thereby eliminating all visibility into the location or value of Plaintiffs' funds;

      c.  Cycling assets through AI-generated wallets to fabricate trading histories and simulate arbitrage profits;

      d.  Diverting remnants of sham transactions into a fabricated "profit wallet" falsely represented as arbitrage proceeds;

      e.  Wrongfully exercising dominion and control over at least $5,239,845 in funds from Intellitech Solutions, LLC, received through a combination of bank wires and USDT transfers;

      f.  Using The Eden Alliance, LLC as a vehicle to solicit, hold, and divert investor funds; and

      g.  Leveraging Peter D. Hatzipetros's legal services to create and maintain shell entities through which investor principal was channeled, concealed, and ultimately converted.

110.    As a direct and proximate result of Defendants' actions, Plaintiffs have suffered damages and are entitled to the return of the converted assets, or their equivalent value, together with interest and any other appropriate relief.

**D.  COUNT FOUR: BREACH OF FIDUCIARY DUTY**

111.    Plaintiffs reallege and fully incorporate by reference the preceding paragraphs as if fully set forth herein.

112.    By soliciting and receiving digital assets from Plaintiffs for the purpose of trading on their behalf, Defendants assumed a fiduciary duty to act with the utmost good faith, loyalty, and care.

113.    Defendants breached these duties by:

    a.    Misrepresenting that investor funds would remain stable and secure, when in fact they were funneled through opaque, non-custodial exchanges;

    b.    Laundering assets through ChangeNOW and StealthEX, including by converting funds into Privacy Tokens designed to prevent oversight;

    c.    Concealing investor principal within inception wallets, master wallets, and AI-generated sham wallets to fabricate transaction histories;

    d.    Misleading Plaintiffs by providing access to a so-called "profit wallet" that was nothing more than the residue of circular, self-referential trades;

    e.    Using The Eden Alliance, LLC as a front to give the appearance of legitimate investment operations while diverting funds to Defendants' control; and

    f.    Enabling these breaches through the legal structuring work of Peter D. Hatzipetros, who facilitated the creation and maintenance of corporate vehicles that concealed Defendants' control of investor assets.

114.    As a result of these breaches, Plaintiffs have suffered financial harm and are entitled to compensatory damages, disgorgement, and other equitable relief.

**E.  COUNT FIVE: UNJUST ENRICHMENT**

115.    Plaintiffs reallege and fully incorporate the preceding paragraphs as if fully set forth herein.

116.    Defendants were unjustly enriched at the expense of Plaintiffs by acquiring, retaining, and utilizing their cryptocurrency assets under false pretenses.

117.    It would be inequitable and unjust for Defendants to retain the benefits obtained through this misconduct without returning them to those harmed.

118.    Plaintiffs are entitled to restitution and disgorgement of all funds Defendants received as a result of the fraudulent scheme, along with any profits or gains derived therefrom.

**F.  COUNT SIX: FRAUD**

119.    Plaintiffs reallege and fully incorporate the preceding paragraphs as if fully set forth herein.

120.    Beginning in or about June 2024 and continuing through at least May 2025, Defendants made false representations of material fact, including but not limited to:

    a.    September 2024 – Boggs emailed and texted Plaintiffs investor slide decks claiming that the "Dawn" system produced "guaranteed daily returns" of 1.5% and that investor funds "remain immovable in secure nodes." These statements were false because Defendants were not running genuine arbitrage strategies and funds were not locked in secure nodes but were instead under Boyd's unilateral control.

    b.    October 22, 2024 – At Boyd's direction, Plaintiffs transferred 1.25 million USDC into wallet 0x9210…d638 with the understanding the funds would

be stabilized in USDC. In reality, Boyd immediately converted them into XRP and routed them through ChangeNOW and StealthEX, contrary to his express representations.

c. December 2024 – Defendants, acting through The Eden Alliance, LLC, provided contracts representing that funds were to be pooled and traded through legitimate systems. In reality, Eden Alliance was a shell vehicle used to divert assets.

d. January–May 2025 – Defendants represented that payments routed to Angels Coding LLC were for server hosting at Switch. On or about January 30, 2025, Intellitech LLC wired $1,199,900 USDT to Angels Coding. By May 1, 2025, at least $5,239,845 had been funneled to Angels Coding under this pretense. These statements were false because Angels Coding did not operate servers at Switch; it served as a laundering conduit.

e. Throughout late 2024, Defendants directed Plaintiffs to a so-called "profit wallet" of XRP and claimed it reflected arbitrage proceeds. In truth, it consisted of remnants of circular, AI-generated transactions designed to simulate profits.

121.    Defendants knew these statements were false when made and intended Plaintiffs to rely on them. Plaintiffs reasonably relied on these misrepresentations in investing millions of dollars.

122.    As a direct and proximate result, Plaintiffs suffered substantial economic damages, plus lost appreciation, investigation costs, and attorneys' fees.

## G.  COUNT SEVEN: FRAUDULENT INDUCEMENT

123.    Plaintiffs reallege and fully incorporate the preceding paragraphs as if fully set forth herein.

      a.  July 2024 – At investor meetings, Boyd and Boggs claimed that their proprietary arbitrage engine had been "audited" and had "never lost principal." These statements were false; Defendants had fabricated wallet histories to pass audits.

      b.  Fall 2024 – Eden Alliance contracts and communications promised that assets would be pooled safely, that returns were based on real arbitrage across exchanges, and that smart contracts would proportionally distribute profits. These were false inducements, as Defendants instead diverted funds through ChangeNOW and StealthEX.

      c.  January–April 2025 – Defendants produced Switch-related invoices to justify ongoing capital contributions, and in connection with those invoices, funneled $1.4 million in bank wires and $3.84 million in USDT into Angels Coding LLC. These invoices and representations were fraudulent inducements for Plaintiffs to continue funding the enterprise.

124.    Defendants made these misrepresentations with the specific intent that Plaintiffs would invest. Plaintiffs did so and were harmed as a result.

**H.  COUNT EIGHT: FRAUDULENT CONCEALMENT**

125.    Plaintiffs reallege and fully incorporate the preceding paragraphs as if fully set forth herein.

126.    Defendants owed Plaintiffs a duty to disclose material facts because they accepted Plaintiffs' funds for investment and undertook to manage those funds on Plaintiffs' behalf. Defendants instead concealed:

a. That Boyd alone possessed the administrative keys to investor wallets, contrary to his representations of multi-signature security.

b. That funds were being routed through ChangeNOW and StealthEX into Privacy Tokens, eliminating transparency and traceability.

c. That between January 30 and May 1, 2025, Intellitech Solutions, LLC's payments totaling $5,239,845 to Angels Coding were not actually for hosting fees, but rather, to directly fund Boyd and Boggs's fraud;

d. That attorney Peter D. Hatzipetros created and maintained the shell entities Eden Alliance and Angels Coding, which were used to channel and conceal investor assets; and

e. That Defendants fabricated the "profit wallets" as genuine trading results while concealing the fact that they were residues of circular AI-generated trades.

127.    Defendants' concealments and omissions were intended to, and did, mislead Plaintiffs into believing their assets were safe and profitably invested. Plaintiffs reasonably relied on these omissions and suffered damages as a result.

I.  **COUNT NINE: VIOLATION OF SECTION 10(b) OF THE SECURITIES EXCHANGE ACT AND RULE 10b-5**

128.    Plaintiffs reallege and fully incorporate the preceding paragraphs as if set forth in full herein.

129.    Defendants James Tyler Boyd, Mike Boggs, Peter D. Hatzipetros, The Eden Alliance, LLC,  and Angels Coding LLC directly and indirectly, by use of the means and instrumentalities of interstate commerce, in connection with the purchase and sale of securities, employed devices, schemes, and artifices to defraud; made untrue statements of material fact and

omitted to state material facts necessary to make the statements made not misleading; and engaged in acts, practices, and courses of business which operated as a fraud and deceit upon Plaintiffs, in violation of Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) and Rule 10b-5 (17 C.F.R. § 240.10b-5).

130.    Specifically, Defendants:

    a.   Misrepresented that Plaintiffs' investments would be converted to and held in stablecoins such as USDC or USDT, when in fact they were diverted into XRP and Privacy Tokens through ChangeNOW and StealthEX;

    b.   Presented fabricated "profit wallets" and dashboards as proof of arbitrage returns;

    c.   Concealed the diversion of at least $5.24 million into Angels Coding LLC under the guise of Switch hosting fees;

    d.   Used Eden Alliance, Angels Coding, and JPB International, LLC as shell entities to solicit and launder funds; and

    e.   Omitted material facts, including Boyd's unilateral control over wallets, the role of Hatzipetros in creating shell entities, and the diversion of assets to third-party Dawn Boggs.

    f.   Defendants acted with scienter, in that they knew or recklessly disregarded that their statements and omissions were materially false and misleading. Plaintiffs reasonably relied on these misrepresentations and omissions in deciding to invest.

131.    As a direct and proximate result, Plaintiffs suffered extensive economic damages in addition to lost appreciation.

132.    Plaintiffs seek judgment awarding compensatory damages, prejudgment interest, post-judgment interest, and such other relief as the Court deems just and proper.

## J. COUNT TEN: VIOLATION OF THE TEXAS SECURITIES ACT (TEX. REV. CIV. STAT. ART. 581-33)[5]

133.    Plaintiffs reallege and fully incorporate the preceding paragraphs as if set forth in full herein.

134.    Defendants offered and sold securities to Plaintiffs in Texas by means of untrue statements of material fact and omissions of material fact necessary to make the statements not misleading, in violation of Article 581-33 of the Texas Securities Act.

135.    The investments sold to Plaintiffs constituted "securities" within the meaning of the Act, including investment contracts under *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946). Plaintiffs invested money in a common enterprise with the expectation of profits solely from Defendants' efforts.

136.    Defendants misrepresented and/or omitted the following material facts:

a.    That Plaintiffs' assets would be secure and immovable in arbitrage "nodes";

b.    That returns were based on genuine arbitrage activity rather than fabricated wallet transactions;

c.    That contracts through Eden Alliance represented legitimate trading opportunities;

---

[5] Plaintiffs plead their claims for securities fraud under both federal law (Exchange Act §10(b) and Rule 10b-5) and the Texas Securities Act, Tex. Rev. Civ. Stat. art. 581-33, in the alternative. Plaintiffs do so to preserve all remedies available under both statutory frameworks. Nothing herein should be construed as an election of remedies at this stage. Plaintiffs reserve the right to pursue rescissionary damages and attorneys' fees under the Texas Securities Act, and compensatory damages under Rule 10b-5, consistent with federal and state law and the Court's determination of governing law.

   d.   That payments to Angels Coding LLC were bona fide Switch hosting fees; and

   e.   That investor funds were not being diverted to insiders, including third-party Dawn Boggs.

137.   Defendants acted as "sellers" and "aiders" under the Act. Boyd and Boggs directly solicited investments; Eden Alliance, Angels Coding, and JPB International, LLC received and laundered funds; and Hatzipetros facilitated the creation of shell entities.

138.   As a result, Plaintiffs are entitled to rescissionary damages, including return of the consideration paid for the securities with interest thereon, less any income received, or, if Plaintiffs no longer own the securities, damages in the amount of the consideration paid minus the value received, plus interest.

139.   Plaintiffs are further entitled to recover reasonable attorneys' fees and costs pursuant to the Texas Securities Act.

## K.  COUNT ELEVEN: CIVIL CONSPIRACY TO COMMIT FRAUD

140.   Plaintiffs reallege and fully incorporate the preceding paragraphs as if set forth in full herein.

141.   Defendants Boyd, Boggs, Hatzipetros, The Eden Alliance, LLC, and Angels Coding LLC agreed and conspired together to commit fraud against Plaintiffs.

142.   Overt acts in furtherance of the conspiracy include, but are not limited to:

   a.   Soliciting Plaintiffs with false representations of daily arbitrage profits;

   b.   Creating and maintaining shell entities (Eden Alliance, Angels Coding) to receive and launder investor funds;

   c.   Routing over $5.2 million into Angels Coding LLC under the guise of Switch server hosting;

      d.  Generating fabricated wallets and "profit wallets" to conceal misappropriation; and

      e.  Disbursing diverted assets to third-party Dawn Boggs and other insiders.

143. As a result of this conspiracy, Plaintiffs suffered damages in an amount to be proven at trial.

## VI. EXEMPLARY DAMAGES

144. Plaintiffs seek exemplary (punitive) damages in addition to actual and statutory damages. Exemplary damages are warranted where Defendants' conduct was fraudulent, malicious, oppressive, and undertaken with conscious indifference to the rights of Plaintiffs.

145. Defendants' conduct satisfies this standard:

      a.  *Fraudulent Inducement and Misrepresentation*. Defendants Boyd and Boggs knowingly made false statements to Plaintiffs regarding the safety, stability, and profitability of their investments. They fabricated wallet histories, misrepresented the nature of the "profit wallets," and concealed that funds were being laundered through ChangeNOW, StealthEX, and Privacy Tokens. Defendants further induced Plaintiffs to invest additional capital by presenting falsified Switch invoices and channeling more than $5.2 million into Angels Coding LLC.

      b.  *Fraudulent Concealment*. Defendants owed a duty to disclose material facts once they undertook to manage Plaintiffs' funds. Instead, they concealed Boyd's unilateral control over wallets, the laundering of funds through non-custodial exchanges, the role of Hatzipetros in structuring shell entities, and the diversion of millions of dollars to Angels Coding LLC and JPB

International, LLC. These omissions were deliberate and calculated to deceive.

c.  *Civil RICO Violations*. The pattern of racketeering activity—including wire fraud, money laundering, and use of shell entities such as The Eden Alliance, Angels Coding LLC, and JPB International, LLC—was carried out intentionally over the course of many months. The Enterprise existed for the very purpose of defrauding investors, and Defendants acted with specific intent to deceive and enrich themselves at Plaintiffs' expense.

d.  *Conspiratorial Conduct*. The participation of multiple Defendants, as well as third-party Dawn Boggs as a knowing recipient of investor funds, demonstrates a coordinated agreement to misappropriate and conceal assets, rather than isolated misconduct.

e.  *Securities Fraud*. Defendants' conduct also constitutes securities fraud under both federal law (Section 10(b) of the Securities Exchange Act and Rule 10b-5) and the Texas Securities Act. Defendants offered and sold unregistered investment contracts by means of material misstatements and omissions, including false assurances that funds would be held in USDC stablecoin, that arbitrage systems had been audited and were profitable, and that payments to Angels Coding LLC represented legitimate hosting fees. Defendants further concealed Boyd's unilateral control over wallets, the laundering of funds through ChangeNOW and StealthEX, and the diversion of over $5.2 million into Angels Coding LLC. These acts were undertaken intentionally, with knowledge of their falsity, and with the purpose of

deceiving Plaintiffs into investing. Such conduct demonstrates the type of fraudulent and malicious behavior that justifies an award of exemplary damages.

146.    Because Defendants' conduct was intentional, egregious, and undertaken with willful disregard for Plaintiffs' rights, an award of exemplary damages is appropriate under applicable state law and federal law governing civil RICO.

147.    Plaintiffs therefore respectfully request that the Court award exemplary (punitive) damages in an amount sufficient to punish Defendants and deter similar misconduct, in addition to treble damages under RICO and all other relief requested herein.

## VII.    PRAYER

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendants James Tyler Boyd, Mike Boggs, Peter D. Hatzipetros, The Eden Alliance, LLC, and Angels Coding, LLC, and against any persons or entities acting in concert with them, as follows:

**A. Damages**

i.    Awarding actual damages to Plaintiffs in an amount to be determined at trial;

ii.    Awarding treble damages as permitted under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1964(c);

iii.    Awarding exemplary (punitive) damages under Texas law for Defendants' fraudulent, malicious, and grossly negligent conduct, in addition to treble damages under RICO and compensatory damages under federal securities law;

iv.    Awarding rescissionary damages and attorneys' fees pursuant to the Texas Securities Act, and compensatory damages under federal securities law, in the alternative;

v.     Awarding exemplary and punitive damages in an amount sufficient to punish Defendants for their willful, wanton, and malicious conduct and to deter similar conduct in the future;

**B. Disgorgement and Restitution**

i.     Ordering disgorgement of all ill-gotten gains received by Defendants, including funds traceable to accounts and assets controlled by insiders such as Dawn Boggs;

ii.     Awarding restitution for all funds wrongfully obtained by Defendants, including those funneled through The Eden Alliance, LLC and other shell entities;

**C. Equitable Relief**

i.     Imposing a constructive trust over any assets traceable to investor funds, including those received by insiders such as Dawn Boggs or held by shell entities established with the assistance of Peter D. Hatzipetros;

ii.     Declaring that The Eden Alliance, LLC, and any other entities created or maintained by Defendants, are alter egos of the Enterprise and subject to equitable relief;

**D. Injunctive Relief**

i.     Granting a Temporary Restraining Order pursuant to Fed. R. Civ. P. 65(b), enjoining Defendants and any person acting in concert with them from transferring, concealing, dissipating, or otherwise disposing of any digital or fiat assets in their possession, custody, or control;

ii.     Granting a Preliminary Injunction under Fed. R. Civ. P. 65(a), maintaining the asset freeze and requiring the preservation of all cryptocurrency wallets, servers, exchange credentials, algorithmic code, nodes, and digital infrastructure relevant to the allegations in the Complaint;

    iii.    Entering a Permanent Injunction following final judgment, enjoining Defendants from engaging in further fraudulent conduct and requiring disclosure, accounting, and repatriation of all funds traceable to investor capital;

**E. Receivership**

    i.    Appointing a receiver pursuant to the Court's equitable powers and/or 18 U.S.C. § 1964(a), with authority to take possession of, manage, secure, and account for all digital and fiat assets traceable to investor funds, including those held by The Eden Alliance, LLC and other shell entities, and to oversee forensic recovery, repatriation, and preservation of infrastructure associated with the fraudulent enterprise;

**F. Attorneys' Fees and Costs**

    i.    Awarding reasonable attorneys' fees and costs as authorized by statute, including 18 U.S.C. § 1964(c);

**G. Other Relief**

    i.    Granting such other and further relief as the Court deems just and proper.

DATED: September 19, 2025           Respectfully submitted,

                              */s/Kyle A. Coker*
                              Kyle A. Coker
                              Texas Bar I.D. 24115353
                              kyle@farmercoker.com
                              Kaitlyn M. Coker
                              Texas Bar I.D. 24115264
                              kaitlyn@farmercoker.com

                              **FARMER & COKER, PLLC**
                              901 Main St., Ste. 5330
                              Dallas, TX 75201
                              Tel:    (832) 240-1047

**ATTORNEYS FOR PLAINTIFFS**

**CERTIFICATE OF SERVICE**

I hereby certify that on September 19, 2025, a true and correct copy of the foregoing Plaintiffs' First Amended Complaint was filed electronically with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record who are registered CM/ECF users.

I further certify that any party not registered to receive electronic service through the CM/ECF system will be served with a copy of the foregoing document in accordance with Federal Rule of Civil Procedure 5.

/s/ *Kaitlyn M. Coker*
Kaitlyn M. Coker